611 A.2d 592

**Darone Antonio DERRICOTT**

v.

**STATE of Maryland.**

**No. 133, Sept. Term, 1990.**

Court of Appeals of Maryland.

Aug. 26, 1992.

Philip H. Armstrong (Heeney, Armstrong & Heeney, on brief), Rockville, for petitioner.

Mary Ellen Barbera, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW and J. WILLIAM HINKEL, Administrative Judge of the Third Judicial Circuit of Maryland (Specially Assigned), JJ.

McAULIFFE, Judge.

This case, although involving an initial traffic stop that was concededly valid, ultimately turns on the question of whether the officers who thereafter conducted a limited weapons search of the defendant's vehicle had a reasonable suspicion supported by articulable facts that the defendant was engaged in criminal activity, and that the defendant was armed and dangerous. The trial judge and the Court of Special Appeals found that the facts supported those suspicions. We do not.

### I.

Before trial in the Circuit Court for Montgomery County, Derricott moved to suppress evidence of cocaine found in the passenger compartment of his automobile on the ground that the search violated his Fourth Amendment right to be free from unreasonable searches and seizures. The facts surrounding the search and seizure were presented by Corporal Michael Thomas of the Maryland State Police, the only witness to testify at the suppression hearing.

Corporal Thomas testified that at approximately 6:53 p.m. on 3 June 1988, he was performing a stationary radar operation on Interstate 270 in Bethesda, Maryland, when he observed a northbound brown sports car enter his radar beam at 89 miles per hour in a 55 miles per hour zone. The trooper pursued the speeding vehicle and pulled it over without incident a short distance later. Darone A. Derricott, the driver of the vehicle, stopped in a normal fashion on the median shoulder of the highway, and Corporal Thomas parked approximately 20 feet behind him. Corporal Thomas informed Derricott why he had been stopped, and requested his permit and registration card. Derricott produced these documents without hesitation or nervousness.

As Corporal Thomas stood beside the driver's door of Derricott's vehicle, several facts were apparent to him. He saw that Derricott was a young, black male wearing a blue sweatsuit, gold chains, and a thick, gold ring monogrammed with the word "Pooh." Derricott's vehicle was a 1985 Nissan 300ZX, a sports car. On the dashboard of the Nissan, Corporal Thomas observed a "beeper"—an electronic paging device. On the passenger seat were papers that appeared to have telephone numbers written on them.

Corporal Thomas testified that a number of these facts matched characteristics listed on a local drug courier profile previously distributed by the narcotics section of the State police. Specifically, he said the drug courier profile included the following characteristics which he believed were present in this case: 1) young, black males wearing expensive jewelry; 2) driving expensive cars, usually sports cars; 3) carrying beepers; and 4) in possession of telephone numbers.

After obtaining Derricott's permit and registration card, Corporal Thomas returned to his cruiser. By radio, he requested a check of Derricott's permit and registration card. He was informed by his dispatcher that both were valid, that the vehicle was not stolen, and that Derricott was not the subject of any arrest warrants. Derricott's registration card revealed that he co-owned the vehicle with another person whom Corporal Thomas believed to be a relative of Derricott's. The vehicle bore temporary Maryland tags, signifying recent acquisition.

Corporal Thomas testified that although the routine checks produced no incriminating information and he observed nothing unusual about the conduct or demeanor of Derricott, he requested a back-up officer to respond to the scene and he also requested a "drug dog" for the purpose of conducting a "sniff search" of Derricott or his vehicle for the presence of illicit drugs. Corporal Thomas took these actions, he said, because Derricott and his vehicle matched certain characteristics of the drug courier profile of which he had been made aware.

Approximately five minutes after the initial stop, Trooper Kathy Hunter arrived as a back-up officer. Corporal Thomas informed Trooper Hunter that he thought Derricott might be a drug courier. He then approached Derricott and ordered him to exit his vehicle so that he could be checked for weapons.

Up to this time, Derricott had remained seated in his vehicle, and according to Corporal Thomas, had not exhibited any suspicious behavior. Upon Corporal Thomas' orders, Derricott exited his vehicle, and, as directed, stood between his vehicle and the police cruiser. Corporal Thomas then conducted a pat-down search of Derricott's outer clothing and concluded that he was not armed.

According to Corporal Thomas, Derricott did not appear to be under the influence of any substance, and did not smell of alcohol or of any other drug. The officer testified that Derricott was very calm and acted coherently.

After searching Derricott, Corporal Thomas approached the driver's side door of Derricott's vehicle, which had remained open. Corporal Thomas leaned inside the car and looked around, ostensibly to search for weapons. Between the driver's seat and the center console, Corporal Thomas saw a cellophane bag containing smaller glassine bags of what appeared to be cocaine. He seized the bag, and Derricott was placed under arrest for possession of a controlled dangerous substance.

On these facts, and after argument of counsel, Judge J. James McKenna denied the defendant's motion to suppress. The defendant thereafter waived his right to a jury trial and proceeded to trial before Judge McKenna on an agreed statement of facts. Judge McKenna found him guilty of possessing a controlled dangerous substance with the intent to distribute, and of speeding. Derricott appealed and the Court of Special Appeals affirmed. *Derricott v. State*, 84 Md.App. 192, 578 A.2d 791 (1990). We granted Derricott's petition for a writ of certiorari to consider whether the

search which produced the cocaine was reasonable under the Fourth Amendment.

## II.

To support the warrantless search of the passenger compartment of Derricott's automobile and the seizure of the drugs, the State offers a single justification: that this was a reasonable "frisk" of the defendant and his automobile under the limited "stop and frisk" exception of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny. In *Terry* the Supreme Court held that the police can stop and briefly detain a person for purposes of investigation if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot. Additionally, the Court held that if the articulable facts also support an objectively reasonable suspicion that the person with whom the officer is dealing is armed and dangerous, the officer may conduct a carefully limited search of the outer clothing of such person in an attempt to discover weapons which might be used to assault the officer. *Id.* at 30, 88 S.Ct. at 1884. In *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the Court explained that a *Terry*-type search for weapons may, under some circumstances, extend to the passenger compartment of a vehicle in which the detained person is seated or from which that person has alighted.

> [T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

*Id.* at 1049, 103 S.Ct. at 3481, quoting in part from *Terry*, *supra*, 392 U.S. at 21, 88 S.Ct. at 1880 (footnote omitted).

■ Unlike the right which follows a custodial arrest of a driver, *see New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), the right to conduct a limited search of the passenger compartment of a vehicle for weapons does not automatically arise when the circumstances justify a *Terry* stop. It is only when the circumstances also support the articulable suspicion that the person detained is armed and dangerous that the frisk of outer garments and the limited search of a passenger compartment may be authorized. *Michigan v. Long, supra,* 463 U.S. at 1049–50 n. 14, 103 S.Ct. at 3481 n. 14. "Although a reasonable 'stop' is a necessary predecessor to a reasonable 'frisk,' a reasonable 'frisk' does not inevitably follow in the wake of every reasonable 'stop.'" *Gibbs v. State,* 18 Md. App. 230, 238–39, 306 A.2d 587 (footnote omitted), *cert. denied,* 269 Md. 759 (1973). *See also Simpler v. State,* 318 Md. 311, 319, 568 A.2d 22 (1990).

■ We are thus required to evaluate the totality of the circumstances to decide whether a reasonably prudent person in the officer's position would be warranted in believing that his safety or that of others was in danger. *Terry, supra,* 392 U.S. at 27, 88 S.Ct. at 1883. *See also United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Due weight must be given "not to [an officer's] inchoate and unparticularized suspicion or 'hunch,'" but to "the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry, supra,* 392 U.S. at 27, 88 S.Ct. at 1883; *Quince v. State,* 319 Md. 430, 433, 572 A.2d 1086 (1990).

■ By Corporal Thomas' own testimony, the only facts which contributed to his decision to search Derricott and his vehicle were those that corresponded to the drug courier profile. No other behavior aroused Corporal Thomas' suspicion; nothing else suggested to the trooper that he was engaged in more than a routine traffic stop.

We note that the elements relied on by the officer do not acquire any special legal significance merely because they

comprise a "drug courier profile." *See Sokolow, supra,* 490 U.S. at 10, 109 S.Ct. at 1587. While it is true that "a trained law enforcement agent may be 'able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer,'" such as "the characteristics of persons engaged in ... illegal practices," *United States v. Mendenhall,* 446 U.S. 544, 563, 100 S.Ct. 1870, 1882, 64 L.Ed.2d 497 (1980) (citation omitted), the officer must still be able to articulate why the elements of the profile lead to a reasonable suspicion that the person detained is armed and dangerous. *Sokolow, supra,* 490 U.S. at 9–10, 109 S.Ct. at 1586–87. It is the evidentiary significance of what actually occurred that provides the basis for reasonable suspicion. Indeed, a profile alone may "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures" if a mere match to such a profile were deemed sufficient suspicion to justify a search or seizure. *Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980).

Derricott argues that the characteristics of the local drug courier profile that were similar to his circumstances do not establish reasonable suspicion that he was either engaged in narcotics trafficking, or that he was armed and dangerous. While acknowledging that the initial traffic stop for speeding was justified, Derricott asserts that his conduct warranted nothing more than the issuance of a citation. He claims that to allow even a brief police search based on the attributes of the profile would mean that any young, black male who wears jewelry and drives a sports car equipped with a beeper would now be subject to a search when stopped for a routine traffic violation on the highway. The result, he claims, would be that a vast segment of black citizens would be stripped of their Fourth Amendment protections, and would be subject to the embarrassment and inconvenience of a search and seizure.

Finally, Derricott argues that even if his match to the profile provided the reasonable suspicion to justify his detention beyond the traffic stop, the match alone did not

provide a reasonable basis to believe that he was armed and dangerous so as to justify the search which produced the illicit drugs. Derricott points out that his behavior during the incident was consistently non-threatening and that Corporal Thomas saw nothing on Derricott's person or in his vehicle to suggest the presence of weapons.

The State argues in response that Derricott's match to the drug courier profile did establish reasonable suspicion that he was trafficking in illicit drugs and was armed and dangerous. The State first asserts that race was not a factor in either Corporal Thomas' decision to detain and search Derricott or the circuit court's ruling denying Derricott's motion to suppress. *See Derricott, supra,* 84 Md. App. at 212 n. 6, 578 A.2d 791. Although the profile includes being black as a factor, the State points to testimony by Corporal Thomas that he did not consider race in determining whether Derricott matched the drug courier profile.

■ With regard to the other elements of the profile, the State points out that Corporal Thomas need not have observed Derricott engage in any criminal act to find reasonable suspicion. The State correctly notes that noncriminal behavior, such as that which comprises the other elements of the profile, may alone provide a basis for reasonable suspicion if it can be proven to be of sufficient weight. *See Sokolow, supra,* 490 U.S. at 9–10, 109 S.Ct. at 1586–87. The State argues that this latter requirement is met by the fact that the Narcotics Section has established this "statistically-based profile" of a drug courier in the Washington metropolitan area. According to the State, the Section has determined through its expertise that a match to the profile—being a young male who wears jewelry and drives a sports car that contains a beeper and papers with phone numbers—provides a reasonable basis to believe the individual is involved in drug trafficking and may be armed, thus justifying detention and a search.

We cannot accept this assertion on faith alone. If the State is to argue that this combination of attributes is of special significance when viewed through the collective wisdom of the State police, it must provide an objective basis for its determination. In this case, however, the State has not disclosed any underlying statistics or data to explain why the combination of circumstances at issue here produces reasonable suspicion. No attempt was made to explain how this profile was formulated, or even whether empirical evidence which might lead to its development exists.

■ This is not a case where facts observed by the police officer take on a special meaning when viewed through the experienced eye of that officer. In those instances, the officer, by reason of training and experience, may be able to explain the special significance of the observed facts. When that type of testimony is offered, the officer may be cross-examined concerning the factual basis upon which he or she bases the conclusion, and the opinion will be given no more weight than the foundation upon which it rests.

Here, however, the officer did not attempt to offer his own experience or training as support for the conclusion that the characteristics of the local profile were related to the activities of a drug courier. A "profile" suggests that others, based upon their experience or collected empirical data, have made those conclusions. Where the characteristics of the profile suggest the conclusion for which the profile is offered as a matter of common knowledge and experience, the Court is able to test the validity of the inference. Where, as here, the aggregate of facts does not as a matter of common knowledge permit a reasonable suspicion that criminal activity is afoot, but requires explanation by reason of experience or empirical data that the witness advancing the conclusion does not have, something more will be required. Otherwise, the courts would be required to place blind faith in conclusions of absent law enforcement officials whose hypotheses or statistical foundations cannot be tested for accuracy.

Without more, we are not persuaded that the facts of this case give rise to a reasonable, articulable suspicion that Derricott was trafficking in drugs and was armed and dangerous. Those of his attributes which match the drug courier profile are sufficiently common that allowing a search and seizure, however brief, on this basis alone would subject too many innocent travelers to the invasion of privacy that such police action necessarily entails.

As the Court of Special Appeals observed, Derricott's sex, age, and jewelry [1] "are virtually meaningless standing alone because thousands of innocent persons are so dressed and so adorned." *Derricott, supra,* 84 Md.App. at 212, 578 A.2d 791. To us, the presence of the sports car, the "beeper," and papers with telephone numbers does not significantly change the level of suspicion aroused in this case. A beeper has become a popular enough instrument of communication for both business and personal purposes that many different segments of our population use them. Maintenance workers, delivery persons, messengers, and route salespersons are just a few of the wide variety of

---

**1.** We note in passing that the police profile speaks not of gold jewelry, but of "expensive jewelry." Corporal Thomas testified that Derricott was wearing "gold chains and a gold ring, a very thick gold ring with the monogram of Pooh on it, P–O–O–H." "Gold" chains may be purchased by the foot on street corners and the description of the ring does not strike us as an objet d'art. In the absence of evidence to the contrary, we must assume that the corporal's use of the word "gold" referred to the color of the chains and ring, and not to their metallic content or level of purity. We have a similar concern about whether the vehicle described in this case was a very close fit to the "expensive sports car" characteristic which forms a part of the profile. This brown 1985 Nissan 300ZX was indeed a sports car. It was, however, in June, 1988, three years old. The trial judge was not familiar with the vehicle type, and no evidence of value was offered. Had evidence of value been offered, it more than likely would have shown the vehicle to have had an average retail value of somewhere between $9,650 and $11,225 as of the date of arrest, which apparently was close to the date of purchase. *See Automobile Red Book,* National Market Reports, Inc., Region A (May 15, 1988–June 30, 1988). The vehicle was titled in the names of the defendant and another person not identified in the record, but believed by Corporal Thomas to have been a member of the defendant's family.

people who may carry a beeper and telephone numbers with them on a routine basis.

Our decision is in accord with the requirement that reasonable suspicion be based on more than an "inchoate and unparticularized suspicion or 'hunch'." *Terry, supra,* 392 U.S. at 27, 88 S.Ct. at 1883; *Anderson v. State,* 282 Md. 701, 702, 387 A.2d 281 (1978); *Snow v. State,* 84 Md.App. 243, 248–49, 578 A.2d 816 (1990). For example, the Supreme Court has held that a match to a drug courier profile was insufficient to establish reasonable suspicion where the petitioner had 1) arrived from Fort Lauderdale, a source city for cocaine; 2) arrived early in the morning when law enforcement activity was diminished; 3) appeared to try to conceal the fact that he was travelling with a companion; and 4) carried no luggage other than shoulder bags. *Reid v. Georgia, supra,* 448 U.S. at 440–41, 100 S.Ct. at 2753–54. *See also Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

In a recent Supreme Court case where a match to a drug courier profile led to a finding of reasonable suspicion, other facts concerning suspicious demeanor and conduct, such as travelling under a false name, nervousness, and hurriedness, were apparent. *Sokolow, supra,* 490 U.S. at 5–9, 109 S.Ct. at 1584–86 (suspect had paid $2,100 for two airplane tickets from a roll of $20 bills; traveled under a name that did not match his telephone listing; traveled to Miami, a source city for illicit drugs; stayed in Miami for only 48 hours although his round trip flight would take 20 hours; appeared nervous during his trip; and checked no luggage).

In the case before us, however, the record is uniformly devoid of any suggestion that Derricott acted suspiciously. Throughout Corporal Thomas' testimony, the officer characterized Derricott's behavior as calm and cooperative. Without more, the attributes that the State claims were suspicious about Derricott's appearance simply are not enough to establish the requisite level of reasonable suspicion that Derricott was engaged in criminal activity. As previously

noted, a subsequent search could not lawfully be conducted in the absence of the threshold finding, as well as a further finding of reasonable suspicion that Derricott was armed and dangerous.[2] Accordingly, the search of Derricott's vehicle was improper, and the motion to suppress should have been granted.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE CONVICTION OF UNLAWFULLY POSSESSING A CONTROLLED DANGEROUS SUBSTANCE WITH INTENT TO DISTRIBUTE AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY MONTGOMERY COUNTY.

---

**2.** The State contends that if Corporal Thomas had a reasonable suspicion that Derricott was a drug courier, nothing more was required to support a reasonable suspicion that he was armed and dangerous, *citing, inter alia, Simpler v. State,* 318 Md. 311, 318–19, 568 A.2d 22 (1990). Because we find insufficient support for the threshold *Terry* suspicion, we need not address this contention or consider whether a distinction exists for this purpose between someone "dealing in large quantities of narcotics" and a drug courier.