660 A.2d 1068

**Neil Marshall MUNAFO**

v.

**STATE of Maryland.**

**No. 1747, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

July 3, 1995.

664

Shannon E. Avery, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore and Davis R. Ruark, State's Attorney for Wicomico County, Salisbury, on the brief), for appellee.

Submitted before BISHOP, WENNER and DAVIS, JJ.

DAVIS, Judge.

This is an appeal from a bench trial held in the Circuit Court for Wicomico County, in which appellant Neil Marshall Munafo was convicted of possession of cocaine with intent to distribute and possession of marijuana. Prior to trial, appellant moved to suppress certain physical evidence as the product of an illegal stop. The court denied the motion and admitted the evidence at trial. Appellant was convicted of both charges and was sentenced to seven years incarceration for possession of cocaine with intent to distribute. The sentence for possession of marijuana was merged. Appellant presents the following question for our review:

Did the trial court err in denying appellant's motion to suppress?

## FACTS

On March 10, 1994, at 9:40 p.m., Deputy Michael Houck of the Wicomico County Sheriff's Office was on routine patrol duty. At that time, he observed a white Nissan Maxima cut a street corner, almost colliding with the front end of his police cruiser. Deputy Houck applied his brakes hard to avoid a collision, then made a u-turn and pursued the Maxima. After pacing the car at 49 miles per hour in a 30 mile-per-hour zone, Deputy Houck activated his emergency equipment and stopped the car for exceeding the posted speed limit.

Appellant was the operator and sole occupant of the Maxima. After parking several feet behind the car, Deputy Houck approached and asked for appellant's license and registration. In lieu of the registration, appellant produced the automobile's rental agreement. The two men recognized each other from

an incident the preceding summer,[1] and small talk ensued. Deputy Houck then asked whether appellant had any weapons or drugs in the car, and if he could search the car. Appellant replied that he had no weapons or drugs and did not consent to a search.

Deputy Houck returned to his police vehicle and waited for the results of a license and registration check. As was Deputy Houck's habit for safety reasons, he radioed for assistance from his road supervisor, Sergeant Michael Elliott. Shortly thereafter, the dispatcher informed Deputy Houck that the license and rental agreement checked out. Despite receiving that information, Deputy Houck did not immediately issue a ticket or warning for the speeding offense. Deputy Houck testified that he wrote appellant a warning, but could not remember whether he wrote the warning before Sergeant Elliott arrived or after appellant was arrested. The time written on the warning was 2100 hours, approximately forty minutes prior to the traffic stop.

At some point after stopping the Maxima, Deputy Houck formulated a hunch that appellant had drugs in the car. The primary basis for that hunch was the fact that appellant previously had been arrested for charges relating to cocaine and marijuana.[2] When Sergeant Elliott arrived, two to three minutes after being summoned, Deputy Houck stepped out of his vehicle, and the two officers conferred for one to one and one-half minutes at the rear of appellant's car. Deputy Houck told Sergeant Elliott about his hunch, and asked Sergeant Elliott to walk down the passenger side of the car because he believed that appellant was hiding something with his right arm.

Deputy Houck then approached appellant, who remained seated in the Maxima. As the deputy engaged appellant in a

---

1. Deputy Houck explained that "last summer I stopped him [appellant] for doing the same thing." At that time, no charges were brought, and appellant's car was not searched.

2. The record does not clearly indicate how Deputy Houck knew about appellant's prior arrest.

short conversation, appellant became "nervous" and "flighty" and began to stutter. Although Deputy Houck was carrying appellant's license and the rental agreement, the deputy could not recall whether he returned the documents to appellant at that time. Meanwhile, Sergeant Elliott walked up to the passenger side of the car. According to Deputy Houck, Sergeant Elliott leaned over the front of the car and shined his flashlight inside.

Sergeant Elliott testified that he approached the Maxima from the rear and shined his light in each window as he worked his way to the front. As he moved up to the front passenger's door, Sergeant Elliott observed a clear plastic "baggie" containing a dark-colored "substance" on the console between the seats. Appellant was trying to cover the baggie with his arm. Sergeant Elliott explained what happened next:

> ... I heard the defendant say something about, why are you doing this to me? Don't do this to me.... At that point in time, he raised his arm up, and that's when my flashlight hit the bag, which the bag was not sealed, and then I could actually see what was in the bag ... which I felt was suspected marijuana.

At that point, Sergeant Elliott could see that the baggie contained a "green substance." After noticing the "suspected marijuana," he asked appellant two or three times, "what is in the baggie?" Appellant replied: "There is nothing here. What baggie? What are you talking about?"

Sergeant Elliott looked at Deputy Houck and said "dope or something to that effect." Deputy Houck asked appellant to step out of the car and began to advise him of his rights in accord with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Sergeant Elliott then reached into the car and removed the baggie. When he pulled it out, "a bag of suspected crack cocaine came out also." The two baggies contained, respectively, marijuana and thirteen pieces of crack cocaine. Appellant was immediately arrested. Approximately ten minutes had passed from the initial stop of appellant's car to the moment of his arrest.

Appellant testified briefly on his own behalf, and stated that Deputy Houck did not return the license and rental agreement until after appellant had been arrested and was taken to a police station. The trial court concluded that the traffic stop was based on reasonable suspicion and denied appellant's motion to suppress. The case proceeded to a bench trial with an agreed statement of facts, and the trial judge found appellant guilty on the charges set forth above. This appeal followed.

## LEGAL ANALYSIS

### I

When reviewing a trial court's denial of a motion to suppress, an appellate court may consider only the record of the suppression hearing. *Malcolm v. State*, 314 Md. 221, 231 n. 12, 550 A.2d 670 (1988); *Aiken v. State*, 101 Md.App. 557, 563, 647 A.2d 1229 (1994). We give great deference to the trial court's first-level fact-finding and will accept the trial court's findings of fact unless clearly erroneous. *Riddick v. State*, 319 Md. 180, 183, 571 A.2d 1239 (1990); *Aiken*, 101 Md.App. at 563, 647 A.2d 1229. Moreover, we review the facts and the evidence in the light most favorable to the State as the party prevailing on the motion. *Riddick*, 319 Md. at 183, 571 A.2d 1239; *Cherry v. State*, 86 Md.App. 234, 237, 586 A.2d 70 (1991). In applying the law to those facts, however, we make an independent constitutional appraisal, and give no deference to the trial court's legal conclusions. *Riddick*, 319 Md. at 183, 571 A.2d 1239; *Aguilar v. State*, 88 Md.App. 276, 282, 594 A.2d 1167 (1991).

Appellant contends that the trial court erred in denying his motion to suppress the marijuana and crack cocaine because the evidence was seized during an illegal detention. Although he concedes that the traffic stop effected by Deputy Houck was legal, appellant maintains that there were actually two stops that evening: (1) the initial traffic stop; and (2) a second stop which occurred immediately thereafter. Appellant argues that Deputy Houck was required to issue a ticket

or a warning promptly after receiving the results of the license and registration check. In appellant's view, the continued detention of his vehicle after that point was not justified by a reasonable suspicion and was, therefore, illegal.

As a general rule, a police officer may stop a suspect "if the officer has reasonable suspicion supported by articulable facts that criminal activity may be afoot." *Derricott v. State,* 327 Md. 582, 587, 611 A.2d 592 (1992). Similarly, if the articulable facts also support an objectively reasonable suspicion that the person is armed and dangerous, the officer may conduct a carefully limited search of the person's outer clothing in an attempt to discover weapons that might be used to injure the officer. *Id.*; *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968). In the context of an automobile stop, a search for weapons may be extended to the passenger compartment of the car. *Derricott,* 327 Md. at 587, 611 A.2d 592 (citing *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)).

The Supreme Court has made it clear that the detention of a person "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). Accordingly, the Court has recognized that the detention of an automobile and its occupant(s) constitutes a "seizure" within the meaning of the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention quite brief." *Snow v. State,* 84 Md.App. 243, 265, 578 A.2d 816 (1990) (quoting *Berkemer v. McCarty,* 468 U.S. 420, 436–37, 104 S.Ct. 3138, 3148, 82 L.Ed.2d 317 (1984)). In *Snow,* 84 Md.App. at 248, 578 A.2d 816, we concluded that the purpose of a traffic stop is to issue a citation or warning. Once that purpose has been satisfied, the continued detention of a vehicle and its occupant(s) constitutes a second stop, and must be independently justified by reasonable suspicion.

The point may be illustrated by juxtaposing the facts of *Snow* with our subsequent decision in *In re Montrail M.,* 87

Md.App. 420, 589 A.2d 1318 (1991), *aff'd,* 325 Md. 527, 601 A.2d 1102 (1992). In *Snow,* a state trooper stopped an automobile for speeding. After the trooper issued a citation, he continued to detain the driver in order to search his car for drugs. Using a trained dog, the officer conducted a scan of the car, and the dog indicated that narcotics were present. We observed that "the fact that the initial stop for speeding in the instant case was valid, does not necessarily legitimize what occurred afterwards." *Snow,* 84 Md.App. at 253–254, 578 A.2d 816. Because the purpose of the initial stop had been satisfied, we concluded that the trooper detained Snow and his vehicle twice: once when he stopped Snow for speeding, and again when he continued to hold Snow after issuing a ticket. As in the present case, the total length of the stop was brief, and did not exceed the normal duration for a traffic stop. *Id.* at 264, 268, 578 A.2d 816.

In *Montrail M.,* 87 Md.App. at 437, 589 A.2d 1318, by contrast, we held that a single detention took place. In that case, a sheriff's deputy observed a station wagon parked outside a business in an isolated area early in the morning. There were three persons in the car. The deputy called for backup, knowing that the only other unit on duty at the time was a canine unit. The deputy spoke with the driver, and his suspicions were further aroused by the driver's explanation of what he was doing in that particular location at 3:30 a.m.[3] The deputy obtained the driver's license and registration and began to run a check. Before the check was completed, the canine unit arrived, and the deputy conducted a quick scan of the station wagon. After the dog indicated that drugs were present, the deputy searched the car and found both marijuana and crack cocaine. *Id.* at 428–30, 589 A.2d 1318.

---

**3.** The driver stated that he had problems with his brakes, and came to an abrupt stop in the parking lot. The deputy noticed, however, that the surface of the gravel lot was undisturbed. The driver indicated that something was wrong with the rear tire, but the deputy looked at the tire and noticed nothing out of the ordinary. Finally, the driver informed the deputy that he was on his way to Butlertown. The deputy noted that the driver had chosen a roundabout route. *Id.* at 428–29, 589 A.2d 1318.

Our analysis of the situation emphasized two points. First, the canine scan occurred *during* an otherwise valid stop, which was based on reasonable suspicion. At the time that the scan took place, the deputy was still awaiting the results of the license and registration check. Second, we noted that the scan did not prolong the detention. Because the scan was conducted in a public place and did not inconvenience the car's occupants, the scan itself did not constitute a search within the meaning of the Fourth Amendment. *Id.* at 436–37, 589 A.2d 1318. *See United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983); *United States v. Dovali–Avila,* 895 F.2d 206 (5th Cir.1990); *United States v. Morales–Zamora,* 914 F.2d 200 (10th Cir.1990).

The distinguishing fact in the present case is that Deputy Houck did not actually issue a citation or warning after receiving word that Munafo's license and rental agreement were valid. Rather, he waited for Sergeant Elliott to arrive on the scene before approaching appellant a second time. Even then it is unclear whether Deputy Houck intended to issue a citation when he approached the vehicle a second time. We find it more than slightly illogical to allow officers to circumvent *Snow* merely by waiting to issue a citation until after conducting a search of a detained vehicle.

Whether appellant was effectively stopped twice for constitutional purposes is not a question of fact, but one of constitutional analysis. Accordingly, the trial court's conclusion in that regard is not entitled to deference. Deputy Houck testified that the stop at issue here lasted approximately ten minutes and that an average traffic stop lasts ten to fifteen minutes. Based on this testimony, the trial judge attempted to distinguish the present case from *Snow,* on the ground that "a long wait" was not involved. As appellant correctly notes, we rejected that argument in *Snow.* We said:

> The State, however, also justifies the detention of Snow's vehicle on the basis that the total time that elapsed between the stop and the completion of the scan did not exceed the normal time for processing papers during a traffic stop....

Although it is true that the duration of a stop is a factor in calculating whether an intrusion is within constitutional limits, *see Royer*, 460 U.S. at 500, 103 S.Ct. at 1325, the State must first demonstrate a reasonable, articulable suspicion that a crime is being or is about to be committed. *Id.* at 264–65, 578 A.2d 816. Even the brief detention of a vehicle and its occupant(s) must be justified by a reasonable suspicion. *Id.*; *Berkemer*, 468 U.S. at 436–37, 104 S.Ct. at 3148.

In the present case, the original traffic stop was justified solely by appellant's speeding and reckless driving. Once Deputy Houck learned that appellant's license and registration were in order, he was required to end the stop promptly and send appellant on his way. Instead, he waited two to three minutes for Sergeant Elliott to arrive, and spent an additional minute or two discussing the situation with Sergeant Elliott before the two officers approached the car together. Deputy Houck testified that he did not remember returning appellant's license, that he did not remember giving appellant a ticket or warning, and that he did not tell appellant that he was free to leave. Instead, Deputy Houck engaged appellant in conversation while Sergeant Elliott scanned the car with a flashlight. Although the delay was brief, it was entirely unjustified by the purpose of the original stop. As in *Snow*, we conclude that Deputy Houck's continued detention of appellant constituted a separate stop.

The question we must now consider is whether that second stop was also based on reasonable suspicion. As previously noted, an officer may stop a suspect "if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *Derricott*, 327 Md. at 587, 611 A.2d 592. The necessary suspicion must rise above the level of a mere belief or hunch. *Id.* at 593, 611 A.2d 592; *State v. Darden*, 93 Md.App. 373, 384–85, 612 A.2d 339, *cert. denied*, 328 Md. 447, 614 A.2d 974 (1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2459, 124 L.Ed.2d 673 (1993). Rather, there must be " 'some minimal level of objective justification' for making

the stop." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *INS v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984)). The level of suspicion required in order to constitute reasonable, articulable suspicion " 'is considerably less than the proof of wrongdoing by a preponderance of the evidence' " and " 'obviously less demanding than that for probable cause.' " *Graham v. State,* 325 Md. 398, 408, 601 A.2d 131 (1992) (quoting *Quince v. State,* 319 Md. 430, 433, 572 A.2d 1086 (1990)). *See also Sokolow,* 490 U.S. at 7, 109 S.Ct. at 1585. In determining whether reasonable, articulable suspicion exists, the court must examine the totality of the circumstances. *Graham,* 325 Md. at 408, 601 A.2d 131; *Darden,* 93 Md.App. at 385, 612 A.2d 339. The variables to be considered include the environment in which the detention occurs, as well as the appearance, conduct, and criminal record of the detainee.[4] *Mosley v. State,* 45 Md.App. 88, 92–93, 411 A.2d 1081 (1980), *aff'd,* 289 Md. 571, 425 A.2d 1039 (1981).

In *Snow,* 84 Md.App. at 260, 578 A.2d 816, the trooper who detained Snow articulated four reasons underlying his suspicion that Snow was carrying drugs: (1) Snow seemed nervous and avoided making eye contact; (2) Snow was travelling from Philadelphia to Washington, D.C., a route commonly used to transport drugs; (3) three air fresheners hung from the rearview mirror of Snow's vehicle; and (4) Snow did not consent to a search. Under the totality of the circumstances, we concluded, the trooper did not have a reasonable suspicion that Snow was engaged in criminal activity other than speeding, and could not detain Snow after a ticket had been issued. *Id.* at 263, 578 A.2d 816.

We begin our analysis of the present case by noting certain facts that did not serve as the basis for Deputy Houck's

---

4. In the case at bar, the only evidence concerning the environment was the testimony of Sergeant Elliott. When asked to describe the area where the stop occurred, Sergeant Elliott responded, "It's basically a black neighborhood." Neither Detective Houck nor Sergeant Elliott suggested that Detective Houck's suspicion was based on the character of the neighborhood.

suspicion. The State contends that Deputy Houck had a reasonable fear that appellant might be armed and dangerous, and that this fear alone was sufficient to justify detaining appellant until Sergeant Elliott arrived. We disagree. Although Deputy Houck stated that he routinely calls for backup for safety reasons, he did not, at any point in his testimony, articulate any fear that appellant might be armed on this particular occasion. Indeed, he engaged in small talk with appellant before running the license check, and repeatedly referred to appellant as "Neil" during his testimony at the suppression hearing.

Deputy Houck thought that appellant seemed to be hiding something with his right arm, and asked appellant whether he had any weapons. He did not, at any point, suggest that the "something" might be a weapon. When asked why he waited for Sergeant Elliott, Deputy Houck stated that he wanted to talk with Elliott. Deputy Houck did not state that he was afraid to approach appellant a second time without backup. When questioned point blank by defense counsel, both Deputy Houck and Sergeant Elliott indicated that the purpose of approaching the car jointly was to test Deputy Houck's hunch that appellant might have drugs.[5] The possibility that appellant might be armed was never mentioned.

Relying on *Commonwealth v. Lehman,* 265 Pa.Super. 480, 402 A.2d 539 (1979), the State also suggests that appellant's erratic driving was part of the factual basis for Deputy Houck's suspicion. Again, we disagree. In *Snow,* 84 Md.App. at 265, 578 A.2d 816, we explained that "[e]rratic driving is suspicious and well known to be associated with drunk driving

---

5. During defense counsel's cross-examination of Sergeant Elliott, the following exchange took place:

THE WITNESS: Yes. I went around the passenger's side of the vehicle.

BY [DEFENSE COUNSEL]:

Q And what, your intent for that was to snoop around a little bit to see if you could see what was in the vehicle, is that correct?

A Yes.

Q And Deputy Houck's was the same, correct?

A As far as I know.

or driving under the influence of drugs." Thus, *Lehman* "stands for the proposition that an officer who observed eccentric driving had 'ample justification' to stop the driver." *Id.* By contrast, appellant was not suspected of driving under the influence of drugs or alcohol. Erratic driving is simply unrelated to mere possession of drugs and cannot serve as the basis for reasonable suspicion. As with the weapons issue, Deputy Houck's testimony does not mention appellant's erratic driving as part of the basis for his suspicion. In assessing whether reasonable suspicion existed, we must rely on the testimony of the police officer, and not on speculation by the State as to what the officer *could* have or *might* have believed.

Deputy Houck testified that his suspicion was based entirely on two observations: appellant's prior arrest for drug-related offenses, and the fact that appellant "seemed" to be hiding something under his right arm. Those two facts, taken together, are not sufficient to create a reasonable, articulable suspicion that appellant was breaking the law. When weapons are not involved, we are unwilling to say that the slightest "suspicious" movement by a person with a known criminal record will justify a detention. As we noted in *Snow*, 84 Md.App. at 262, 578 A.2d 816, suspicion is in the eye of the beholder and truly innocuous behavior may be readily construed as "suspicious." Under the circumstances, to hold that Deputy Houck had a reasonable suspicion for the continued detention of appellant would be tantamount to holding that a person with a prior criminal history may be detained at will.

By his own testimony, Deputy Houck merely had a "hunch" that appellant was in possession of drugs. A hunch, without more, does not rise to the level of reasonable suspicion. *See Derricott*, 327 Md. at 593, 611 A.2d 592; *Snow*, 84 Md.App. at 267–68, 578 A.2d 816. The trial court erred when it denied appellant's motion to suppress.

## II

The State's motion to strike the appendix contained in appellant's brief is granted. Maryland Rule 8–504(b) does

limit an appendix to the pertinent part of any jury instructions or the opinion of the lower court dealing with points raised on appeal.   In the present case, appellant's nine-page appendix includes seven pages of argument by counsel, plus two pages containing the trial court's ruling.   Appellant's attempt to include argument in his appendix is clearly barred by Rule 8–504(b).   *See Eiland v. State,* 92 Md.App. 56, 102–103, 607 A.2d 42 (1992), *rev'd on other grounds sub nom. Tyler v. State,* 330 Md. 261, 623 A.2d 648 (1993).   Consequently, the first seven pages of appellant's appendix shall be stricken, with appellant paying the costs thereof.

**JUDGMENTS OF THE CIRCUIT COURT FOR WICOMICO COUNTY REVERSED.**

**APPELLANT TO PAY ALL COSTS RELATING TO FIRST SEVEN PAGES OF APPENDIX TO APPELLANT'S BRIEF.   REMAINING COSTS TO BE PAID BY WICOMICO COUNTY.**