732 A.2d 312

**Bernard Everton McKOY**

v.

**STATE of Maryland.**

**No. 786, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

June 30, 1999.

Mark Colvin, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Steven L. Holcomb, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Submitted before MOYLAN, EYLER and PAUL E. ALPERT (Ret., specially assigned), JJ.

PAUL E. ALPERT, Judge (Ret., specially assigned).

Bernard Everton McKoy, the appellant, was charged with possession of cocaine, possession of cocaine with intent to distribute, and bringing into Maryland a mixture containing 28 grams or greater of cocaine. Prior to trial, he filed a motion to suppress physical evidence seized by the police and statements he made. The motion was heard and denied by the Honorable Edward D.E. Rollins, Jr. Appellant was convicted by a jury in the Circuit Court for Cecil County (Donaldson C. Cole, Jr., J.) of possession of cocaine with intent to distribute and bringing into Maryland a mixture containing 28 grams or greater of cocaine.[1] Judge Cole imposed concurrent eight year terms of imprisonment on appellant.

Appellant's initial appeal to this Court was dismissed as untimely. Appellant filed a petition for post-conviction relief seeking, *inter alia*, a belated appeal. On or about July 7, 1998, a Consent Order was entered, appellant's petition was granted, and appellant was permitted to note a belated appeal. This appeal was noted on July 8, 1998.[2] Appellant presents two questions on appeal:

---

**1.** After the jury announced its verdict on the charges of possession with intent to distribute and bringing into the State a mixture of cocaine in the amount of 28 grams or greater, the trial court stated that there was no need to hear the verdict on the possession count "because they merge."

**2.** The Consent Order is not dated. It was apparently attached to the Notice of Appeal which certified service to the State's Attorney and the Attorney General's Criminal Appeal Division on July 8. Both the Consent Order and Notice of Appeal were docketed on July 13, 1998.

I. Did the trial court err in denying his motion to suppress?

II. Did the trial court commit plain error in instructing the jury that, in effect, actual knowledge of the presence and nature of a drug was not a necessary element of the charges against him?

Perceiving no reversible error, we affirm the judgments of the circuit court.

## FACTS

The following facts were presented at the motion to suppress:

At approximately 2:50 p.m. on February 7, 1996, Maryland State Trooper James Nolan stopped a 1996 Ford Taurus traveling southbound on I-95 in Cecil County, Maryland. The reason for the stop was that the vehicle was traveling 77 miles per hour in a 65 mile per hour zone. Angela Kaiser was the driver of the car. Appellant was the vehicle's sole passenger.

Ms. Kaiser brought the Taurus to a stop. Trooper Nolan parked behind it. The trooper exited his car and walked to a point between the two vehicles. Ms. Kaiser had stopped somewhat close to the roadway; Trooper Nolan "motioned" her to exit the Taurus. Ms. Kaiser exited the car and walked to where the trooper was standing. Trooper Nolan told her that he had stopped her because she had been speeding. According to the trooper, she became "very nervous" and "overapologetic." She explained that the vehicle she was driving was a rental vehicle and that she was not familiar with it.

Officer Nolan asked to see Ms. Kaiser's license and the rental agreement for the Taurus. Ms. Kaiser told the trooper that she had a valid Maryland license but that she did not have it with her. She also told him that she would have to get the rental agreement from appellant. Ms. Kaiser told Trooper Nolan that she had been introduced to appellant by her boyfriend but that she did not know his name. She stated

that they had come from visiting appellant's sister in Connecticut and that they had stayed in Connecticut for a couple of hours. She did not know appellant's sister's name.

Ms. Kaiser retrieved the rental agreement and gave it to Trooper Nolan. Ms. Kaiser was not an authorized driver of the vehicle. Appellant was. Trooper Nolan returned to his vehicle and called the dispatcher to check on the status of Ms. Kaiser's driver's license.

Just after Trooper Nolan had finished speaking to the dispatcher, Maryland State Trooper Christopher Tideberg arrived at the site. Trooper Nolan asked Trooper Tideberg to get identification from appellant. According to Trooper Nolan, the purpose of checking appellant's identification was "to see, if [Ms. Kaiser] didn't come back with a valid license or had no license, someone could drive the car." Trooper Tideberg obtained appellant's driver's license, and Trooper Nolan called the dispatcher to check on the status of the license.

Trooper Nolan then approached appellant and asked where he and Ms. Kaiser had come from and where they were going. Appellant told the trooper that they had been to Connecticut to see his sister and that they had been there for two days. Appellant became upset and asked the trooper to "just write [Ms. Kaiser] a ticket and let [them] go."

Trooper Tideberg had a K–9 dog in his car. Because of Ms. Kaiser's nervousness, and the inconsistent statements about the length of time Ms. Kaiser and appellant had stayed in Connecticut, Trooper Nolan asked Trooper Tideberg to conduct a K–9 scan of the car. At that time, Trooper Nolan had not received any information in response to his request for license checks on Ms. Kaiser and appellant.

Appellant was outside the car before Trooper Tideberg conducted the scan. It is, however, not clear whether appellant exited the vehicle on his own or whether he was asked to do so by one of the officers.[3] Trooper Tideberg stated that

---

3. Trooper Nolan testified that Trooper Tideberg "probably" asked appellant to get out of the car, but that he did not hear him do so.

"the procedure that we follow with state police K–9" is that the occupants are to be outside the vehicle prior to a K–9 scan. The trooper brought the dog to the right rear quarter panel of the Taurus and began the scan. The dog "alerted" at the right rear wheel well, indicating that he detected the odor of illegal drugs. Officer Tideberg had the dog continue the scan. When the dog reached the passenger front door handle, he sat down, which was definitive response. Officer Tideberg searched the vehicle and found a quantity of cocaine inside a gym bag in the trunk of the vehicle. The gym bag also contained women's clothing.

At the time the K–9 alerted, Trooper Nolan had not completed writing the traffic citations for Ms. Kaiser and had not yet received a response regarding the validity of appellant's driver's license.[4]

The following evidence was produced at trial:

At trial, Troopers Nolan and Tideberg testified about the stop and search of the Taurus. The testimony was substantially similar to that presented at the motion to suppress. Trooper Nolan also testified that the Taurus had been rented at the Fort Lauderdale International Airport at 8:12 p.m. on February 5, 1996, and that Ms. Kaiser had not made eye contact with him when he stopped her. He testified that her nervousness and failure to make eye contact were not typical for someone stopped for driving 77 miles per hour in a 65 mile per hour zone.

Trooper Nolan stated that he had not asked for backup. He explained the Trooper Tideberg "just rolled up on [him]." Trooper Nolan also testified that two fingerprints were found

---

Trooper Tideberg stated that, to his belief, he did not ask appellant to get out of the car. Appellant contended that one of the troopers had ordered him out of the car. The motions court believed that it was not necessary to decide whether one of the officers had done so.

4. Ms. Kaiser did have a valid driver's license. Trooper Nolan testified that "prior to the K–9 scan" he had not yet learned whether Ms. Kaiser had a valid license. It is not clear at precisely what point during the stop he learned that her license was valid.

on the gym bag but that they did not belong to either appellant or Ms. Kaiser. In addition, he testified that, at the State Police Barracks after her arrest, Ms. Kaiser said that she had never been to Connecticut.

Trooper Tideberg testified that there was one fingerprint on the bag containing the cocaine and that it was not Ms. Kaiser's or appellant's. The trooper stated that the fingerprint "most likely was [his]." The trooper stated that, when he searched the car, he found a traffic citation with appellant's name that had been issued the previous day in North Carolina. Trooper Tideberg also testified that, at the barracks, he searched appellant and found an envelope with handwritten directions to a place in New York.

Trooper Robert Shelly testified as an expert in the field of narcotics. Trooper Shelly stated that the cocaine seized from the gym bag weighed 726.5 grams and that it had a street value of approximately $72,000. He further testified that the quantity of cocaine seized indicated that it was intended for distribution rather than for personal use.

Ms. Kaiser and appellant both testified about how the cocaine came to be in the Taurus. Not surprisingly, each testified that the other was responsible for the cocaine.

Ms. Kaiser testified for the State. According to Ms. Kaiser, she had met appellant the night before they were stopped by Trooper Nolan. She said she was introduced to appellant in Frederick, Maryland by her ex-boyfriend's roommate, a man named "Yellow." At that time, she did not have a place of her own to stay and was staying at different places with friends. Appellant was going to New York and she decided to go along for the ride. She thought that "Yellow" was going with them.

Before they went to New York, they went to Washington, D.C., where she changed clothes and got a gym bag with clothes to bring with her. When they left Washington, "Yellow" did not come with them.

According to Ms. Kaiser, the two drove to New Jersey and spent the night in a motel. The next morning, appellant left

the motel for about five minutes to make a telephone call. When he returned, they drove to New York. At one point, appellant stopped at a supermarket and brought out a brown bag. He gave it to Ms. Kaiser and asked her to put it in her bag. He then took the bag out of her hand, put it in her gym bag, and put the gym bag in the trunk.

On the drive home, they stopped to get gas and something to eat. Appellant asked her to drive, and she agreed to do so. She was then stopped for speeding. When Trooper Nolan stopped her, appellant told her to say that she had been visiting his sister in Connecticut and that they were driving to Florida.

Ms. Kaiser stated that she thought there might be marijuana in the brown bag, but she had no idea that the bag contained cocaine.

Ms. Kaiser conceded that she had initially lied to the police but said that she did so because she was afraid of appellant. She also testified that she was initially charged with possession with intent to distribute cocaine and importation of cocaine but that she had entered into a plea agreement whereby she would plead guilty only to possession of cocaine. Ms. Kaiser also conceded that, prior to traveling to New York with appellant, she had lived with a man who had been convicted of drug offenses.

Appellant testified that in February, 1996, he was living in Pembrook Pines, Florida. A friend of his, named "Yellowman" had come to Florida to visit him for about a week and a half. "Yellowman" lived in Washington, D.C. and had flown from Washington, D.C. in a Value Jet, but was afraid to fly back. He wanted appellant to rent a car and drive back with him, but appellant did not have a credit card and did not want to spend the time away from his family. On February 5, 1996, however, his sister called him and told him that his daughter's mother, who lived in Connecticut, had had a stroke. A friend agreed to rent the car for him, and appellant agreed that he would drive the car.

According to appellant, he and "Yellowman" drove to Washington, D.C. After stopping there for a few hours, they drove to Frederick, Maryland, where Yellowman introduced him to Ms. Kaiser. Yellowman asked him to take Ms. Kaiser to New York. He told appellant that she had stayed with some people there and that she had some clothes to pick up. Appellant agreed to drive her. Yellowman wrote out directions to the place Ms. Kaiser was to go.

Appellant and Ms. Kaiser first drove to D.C., where Ms. Kaiser changed her clothes. They then drove to New Jersey, where they spent the night in a motel. The next morning, appellant drove to his sister's house in Norwalk, Connecticut. His sister was not home, but he knew where she left her housekey, so he let himself inside. He called his daughter, but was told that she was out of town. He then drove Ms. Kaiser to New York, following the directions Yellowman had given him.

They arrived at the location to which Yellowman had directed him and appellant parked the vehicle. Ms. Kaiser left the car for approximately 45 minutes. When she returned, she was carrying a gym bag. She asked him to put the gym bag in the trunk so that no one would steal it. They then started back to D.C. so that appellant could drop Ms. Kaiser off. According to appellant, he did not know what was in the gym bag. Appellant denied that he had told Trooper Nolan that he had been in Connecticut for two days. Appellant also stated that he was not upset because Ms. Kaiser was getting a ticket but because the stop had lasted almost an hour.

## DISCUSSION

Appellant's first contention is that the trial court erred in denying his motion to suppress. At the suppression hearing, appellant relied upon our decision in *State v. Wilson*, 106 Md.App. 24, 44, 664 A.2d 1 (1995), that a police officer does not have the automatic right to order a passenger out of a stopped vehicle during a routine traffic stop. Appellant notes, however, that that decision was subsequently overruled by the

United States Supreme Court in *Maryland v. Wilson*, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997), and he no longer advances that position. Rather, appellant relies on a ground that he did not mention in the trial court: that the officers detained appellant and Ms. Kaiser for an unreasonable period so the car could be subjected to a K–9 scan. Appellant relies upon three recent cases decided by this Court to support his contention: *Pryor v. State*, 122 Md.App. 671, 716 A.2d 338, *cert. denied*, 352 Md. 312, 721 A.2d 990 (1998); *Graham v. State*, 119 Md.App. 444, 705 A.2d 82 (1998); and *Whitehead v. State*, 116 Md.App. 497, 698 A.2d 1115, *cert. denied*, 348 Md. 207, 703 A.2d 148 (1997). Appellant further contends that, because we held in *Pryor* that a detention of between 20 and 25 minutes was "much longer than reasonable," we should remand this case for a determination of how long appellant and Ms. Kaiser were detained.

The State argues that the contention that appellant presents here is unpreserved because appellant did not raise it in the motions court. It further argues that the cases appellant cites are distinguishable from the present case because, here, the purpose of the traffic stop had not been completed before the dog alerted to the presence of drugs in the vehicle.

Appellant, in a reply brief, argues that we should consider the merits of his contention despite his failure to raise it in the motions court. He argues that he could not be expected to foresee that *Wilson* would be overturned and that the cases upon which he does rely were decided after the date of his motion hearing.

■ We agree that appellant could not be expected to foresee that *Wilson* would be overruled. Nothing prevented appellant, however, from arguing at the motions hearing that the duration of the stop was too long. Although the cases appellant cites were decided after his motions hearing, *Munafo v. State*, 105 Md.App. 662, 660 A.2d 1068 (1995)(detention of motorist after purpose of traffic stop effectuated was unlawful unless the officers had independent justification for continued detention), and *Snow v. State*, 84 Md.App. 243, 265, 578 A.2d

816 (1990) (lack of eye contact, nervousness, and refusal to consent to search of vehicle were insufficient to establish reasonable articulable suspicion to justify continued stop of vehicle), were decided prior to the time of the hearing. Those cases recognize the principle upon which appellant bases his position: that a traffic stop which continues after its purpose has been effectuated is unlawful unless justified by something in addition to the justification for the initial stop. Thus, at the time the motion was argued, legal authority existed that a search conducted after an excessive stop is illegal, and appellant could have raised the argument he now presents at the motion to suppress. Appellant, therefore, has failed to preserve the issue for our consideration.

Even if we were to consider appellant's argument to be founded on his reading of *Pryor* as holding that a traffic stop of twenty or twenty-five minutes is *per se* unreasonable, we would find no merit in that contention.

In *Munafo*, we stated that the United States Supreme Court had recognized that the detention of an automobile and its occupant(s) constitutes a "seizure" within the meaning of the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention quite brief." 105 Md. App. at 670, 660 A.2d 1068 (quoting *Snow*, 84 Md.App. at 265, 578 A.2d 816, which, in turn, quoted *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). We noted that the purpose of a traffic stop is to issue a citation or a warning. Once that purpose has been satisfied, the continued detention of a vehicle and its occupant(s) constitutes a second stop, and must be independently justified by reasonable suspicion. 105 Md.App. at 670, 660 A.2d 1068. We held, therefore, that the continued detention of Munafo, after the officer had learned that Munafo's driver's license and rental agreement were valid, was a violation of Munafo's fourth amendment rights.

Appellant states in his reply brief that "[t]he relevant question is not whether the officers had received the information from the dispatcher and issued Kaiser the ticket and

warning at the time the cocaine was seized; the relevant question is whether more time passed between the initial stop and the seizure of the cocaine than was reasonably necessary to investigate Kaiser's license status and issue her a ticket and warning." We, however, do not see the two questions as entirely independent.

In *Pryor*, we held that a motorist who is subjected to a traffic stop for a minor traffic violation "cannot be detained at the scene of the stop longer than it takes—or reasonably should take—to issue a citation for the traffic violation that the motorist committed." 122 Md.App. at 674–75, 716 A.2d 338. A reasonable time, however, is determined not solely by the duration of the stop, but by whether the officers had a reasonable chance to effectuate the purpose of the stop. In *Pryor*, we noted that "[i]f the K–9 had been present at the moment of the stop, or arrived during the period of permissible detention, its 'perimeter search' of appellant's vehicle would have been entirely proper." 122 Md.App. at 681, n. 6, 716 A.2d 338. We also noted in *Pryor* that the officers were not able to justify an extended detention of Pryor by "technical difficulties" in determining the status of his license or the ownership of the vehicle because they knew that he had a valid driver's license and that he was the registered owner of the vehicle he was driving. 122 Md.App. at 681–82, n. 7, 716 A.2d 338.

We made the same point in *Graham v. State, supra*, 119 Md.App. 444, 705 A.2d 82, where we stated that "allowing the K–9 to scan the vehicle for drugs at a point in time when the trooper 'was still awaiting the results of the license [and registration] check' in such a fashion 'that the scan did not prolong the detention' would have been constitutionally permissible." *Id.* at 469, 705 A.2d 82.

In fact, the United States Supreme Court has expressly rejected a "bright-line" rule governing the duration of traffic stops. *See United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). The Court did, however, deem it appropriate, in determining whether the duration of a stop

was reasonable, to consider whether the police had "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Id.* at 686, 105 S.Ct. 1568.

In the present case there was no suggestion of any delay in Trooper Nolan's request for the licensing information of either Ms. Kaiser or appellant. Further, once Trooper Nolan learned that Ms. Kaiser did not have a driver's license in her possession and that she was not an authorized driver of the rental car, it was within the purpose of the traffic stop for the trooper to check appellant's license.[5] Trooper Nolan had not completed writing the citations for Ms. Kaiser at the time the K-9 alerted to the presence of drugs in the vehicle, and he had not yet received a response to his request regarding the validity of appellant's license at the time of the scan. Trooper Nolan did not detain appellant and Ms. Kaiser any longer than reasonably necessary to determine whether Ms. Kaiser had a valid license. Accordingly, the K-9 scan did not violate appellant's rights, and the trial court correctly denied the motion to suppress.

## II.

Appellant's second question is whether the trial court committed plain error in instructing the jury.

The trial court instructed the jury:

Now in this case, let me tell you what you are dealing with first. In all these cases, they are drugs [sic] cases, and as an element of the offenses charged, the accused in order to be found guilty must know of both the presence and general character or illicit nature of a substance. They have to know *or should have known* that it was an illegal

---

5. Even if the stated purpose was pretextual, the trooper's conduct would not be invalidated because (1) he had probable cause to make the traffic stop, and (2) the K-9 scan was performed before the trooper was able to determine whether the driver had a valid license. "Subjective intentions play no role in the ordinary, probable cause analysis." *Whren et al. v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). *See also Pryor, supra* at 679, 716 A.2d 338.

drug—not necessarily cocaine, but any illegal drug. Of course, such knowledge may be proven by circumstances and inferences drawn therefrom.

Now I am reading right from the statute. A person who brings into this state—I'm going to ad lib—a mixture containing 28 grams or greater of cocaine is guilty of a crime—that is a smuggling statute. If you know *or should have known* it was cocaine and you got caught bringing in 28 grams or greater of a mixture of cocaine into the state from another area, then that's all that's needed to be proven.

(Emphasis added.)

Appellant states that the above instruction is incorrect. Citing *Dawkins v. State,* 313 Md. 638, 651, 547 A.2d 1041 (1988), he contends that, for a defendant to be convicted of drug possession or smuggling, it is not enough for the State to prove that appellant should have known of the general character and illicit nature of the substance. Rather, he contends, the defendant must have actual knowledge of the nature of the general character and illicit nature of the drug. Appellant asks us to hold that the trial court's instruction to the jury constitutes reversible error.

The State responds, as a preliminary matter, that appellant failed to preserve a claim that the instruction was erroneous because he did not object to the instruction in the trial court. The State also contends that, in fact, actual knowledge of the nature of the drug is not required in order for appellant to be convicted of the smuggling offense. The State further contends that there was sufficient evidence from which the jury could find that appellant had actual knowledge of the cocaine in the vehicle.

We need not consider whether, in fact, the trial court's instruction constituted error. Appellant acknowledges that he made no objection to the instruction and that the issue, therefore, is not preserved for appellate review. Maryland Rule 4–325(e). He asks us, however, to exercise extraordinary discretion by way of noticing what he alleges to be "plain error," notwithstanding his failure to preserve the issues. We

decline to do so. *Stockton v. State,* 107 Md.App. 395, 668 A.2d 936 (1995), *cert. denied,* 342 Md. 116, 673 A.2d 707 (1996).

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**