814 A.2d 86

Keith A. LEE,

v.

Gary CLINE, et al.

No. 2275, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Dec. 26, 2002.

40

**44**

Willie J. Mahone, Frederick, for appellant.

Kevin Karpinski (Victoria Shearer and Allen, Karpinski, Bryant & Karp, on the brief), Baltimore, for appellee.

Argued before SALMON, JAMES R. EYLER and ADKINS, JJ.

ADKINS, Judge.

In this tort case involving an allegedly unconstitutional "second stop," we encounter one of the Gordian knots of Maryland governmental immunity law—whether, under the Maryland Tort Claims Act, a police officer classified as State personnel has a qualified immunity defense against a constitutional tort claim alleging a violation of the Maryland Declaration of Rights.

Frederick County Deputy Sheriff Gary Cline,[1] appellee, stopped Keith A. Lee, appellant, because Lee's front license

---

1. Cline, as a deputy sheriff of Frederick County, is classified as "State personnel" under the Maryland Tort Claims Act. *See* Md.Code (1984,

plate was missing. After Lee produced the plate, and explained that it had been damaged that morning in a car wash, Cline asked Lee for consent to search his car. Lee refused. Cline asked dispatch to send a canine unit, which eventually arrived and scanned Lee's vehicle without an alert. Cline wrote two warning citations, which he delivered after the scan.

Claiming racial profiling, retaliation, and an unjustified detention, Lee, who is African American, sued Cline for violating his constitutional rights under the Maryland Declaration of Rights. On summary judgment, the Circuit Court for Frederick County ruled, *inter alia*, that Cline had qualified immunity for his constitutional torts. Citing Court of Appeals decisions, Lee argues that Cline does not have qualified immunity for constitutional torts. Citing broad statutory language, Cline argues that he does. We shall hold that, based on the Maryland Tort Claims Act, police officers classified as State personnel do have qualified immunity from liability for their constitutional torts.

## FACTS AND LEGAL PROCEEDINGS

### The Stop

On March 12, 1994, Keith Lee left his Frederick home to run some errands and then get in a few hours of work at the financial services company where he was a vice president. Dressed in jeans and a sweater, he drove his black BMW to the bank, the car wash, and the dry cleaners. As he returned to his car from an errand, he noticed that his front license plate was missing. He immediately returned to the car wash, where he found the tag. Because it was mangled, he could not reattach it. Instead, he placed it on the floor directly behind his seat.

Lee was driving on Route 355 when he saw a marked police car with its lights flashing, two cars behind him. The car between Lee and the cruiser pulled over, but the cruiser went

---

1999 Repl.Vol., 2001 Cum.Supp.), § 12–101(a)(6) of the State Government Article.

around it, then deactivated its lights. After another mile, the cruiser lights reactivated, and Lee pulled over into a driveway off of the heavily traveled thoroughfare.

Frederick County Deputy Sheriff Gary Cline came to Lee's window and asked for his driver's license and vehicle registration. Lee retrieved his wallet from the center console and mistakenly handed Cline a credit card instead of his license. Cline asked for the license and Lee gave it to him. Lee then sifted through the papers in his glove compartment and found the registration. As he presented it to Cline, Lee asked why he had been pulled over. Cline replied that his front license plate was missing, whereupon Lee explained that it had come off in the car wash. Lee immediately presented the damaged tag to Cline.

Cline then said that on these types of stops in Frederick County, he liked to search vehicles for illegal narcotics and weapons. He asked Lee if he would consent to a search of his car. Lee responded that Cline did not have probable cause or reason to suspect that he was transporting any illegal items, and that he would not consent to a search. Cline retorted, "I don't need your permission to search the car. I can get dogs in here and search it without your permission." Lee maintained his refusal to a consensual search, and Cline returned to his cruiser with Lee's license and registration.

While Lee was waiting in his car, he observed that Cline appeared to be talking on his handset radio and writing. After about 15 minutes, another patrol car arrived, apparently as back up. Cline got out of his car and talked with the officer for several minutes. During this time, Lee got out of his car because he was tired of just sitting there. About 30 seconds after he did so, Cline yelled at Lee to get back into his car. Lee complied. Eventually, the other officer left the scene.

After several more minutes, Maryland State Trooper Eric Fogle arrived with his dog, which was trained to detect narcotics. Cline again exited his cruiser and spoke with Fogle for a couple of minutes. Fogle approached Lee's vehicle, and asked Lee whether he had any drugs in the car. Lee said

that he did not. Fogle and his dog then circled Lee's car. When the dog did not alert, Fogle returned to his car and left.

At that point, Cline returned to Lee's vehicle to deliver two warning citations involving the missing tag. After commenting that he could have ticketed Lee, Cline asked Lee to sign both citations. Lee did so, whereupon Cline returned his license and registration.

Lee proceeded directly to the nearby house of his grandmother, calling his wife along the way. When he arrived, his grandmother already had heard about the stop from someone who saw it. Lee told his cousin about the incident, and then later that day, called his attorney.

Cline does not have any independent recollection of Lee or the stop. A tape of the radio dispatch and other police department records, however, recorded the following:

15:11 Cline reported Lee's tag number and "requested a traffic on that vehicle." Cline testified at his deposition that it is his standard practice to report and request such information before he has pulled over a motorist.

15:13 Dispatch advised that the tag was valid and would expire in July 1994.

15:14 Cline asked the dispatcher to "locate a canine and start him my way." The dispatcher responded that there were no canine units available.

15:16 Dispatch advised that a State of Maryland canine unit was on I–270, near Route 109, and could respond. Cline asked the canine unit to be sent, stating, "I've got a suspect not being too cooperative. Already told me there's no way he's going to give me consent to search. Go ahead and start this way please." Cline then requested information on Lee's driving record and arrest warrant status.

15:17 Dispatch advised that Lee's license was valid, with no points or restrictions, and that Lee's wanted status was negative.

15:22 Officer Henry reported that he was on the scene as backup.

15:23 Cline asked for the "reporting district and beat" information necessary to complete traffic citations. At the same time, he asked for the canine unit's estimated time of arrival, commenting that he had almost finished his paperwork. Dispatch advised that the "ETA" was three minutes.

15:31 Trooper Fogle reported being on the scene. (The K-9 Unit Search Report shows arrival time as 15:30).

15:42 Cline reported that the stop was "cleared."

### The Litigation

Alleging that he had been "detained, seized and searched pursuant to a 'drug courier profile' and policy in practice ... which targets persons of the African American race," Lee filed suit in the Circuit Court for Frederick County. He sued Maryland State Trooper Eric Fogle, the Maryland State Police, Frederick County Sheriff James W. Hagy, Deputy Sheriff Gary Cline, and the County Commissioners of Frederick County. The circuit court dismissed Fogle because the state trooper was not alleged to be responsible for any unlawful detention, and the Maryland State Police because it concluded that Lee's notice of claim under the Maryland Tort Claims Act did not provide adequate notice of his claim against Fogle. Lee filed an amended complaint, asserting a federal civil rights cause of action under 42 U.S.C. section 1983, along with his state law claims for violation of his State constitutional rights, false imprisonment, invasion of privacy, intentional infliction of emotional distress, and negligence. The amended complaint did not name the State, which was Cline's employer for purposes of the Maryland Tort Claims Act, as a defendant.

The remaining defendants removed the case to federal court. After discovery, that court granted summary judgment for Hagy, who did not become sheriff until after this

incident, and for the County Commissioners. In addition, the federal court granted summary judgment in favor of Cline on the section 1983 count. In a memorandum opinion, the court concluded that, although there were factual disputes regarding both the length of the stop and what occurred during the stop, there was insufficient evidence that Cline acted with the type of malice that can defeat a federal section 1983 claim.[2]

On remand to the circuit court, the remaining defendants were Cline and the County Commissioners. They jointly moved for summary judgment on all of the state law claims. At the conclusion of the summary judgment hearing, the circuit court granted Cline summary judgment on all claims, ruling that there had been no violation of Lee's constitutional rights; that Cline had qualified immunity under Md.Code (1974, 2002 Repl.Vol.), section 5–522(b) of the Courts & Judicial Proceedings Article ("CJ"); and that Lee had not overcome Cline's qualified immunity with evidence raising an inference of malice.

## DISCUSSION

Lee offers four reasons for reversing the judgment in favor of Cline on all counts, which we restate in issue format as follows:

I. Did the circuit court err in holding that Lee did not produce sufficient evidence to create a factual dispute as to whether there was a constitutionally unjustified "second stop"?

II. Did the circuit court err in holding that, under section 5–522(b) of the Maryland Tort Claims Act, Cline had a qualified immunity defense against constitutional tort claims?

---

**2.** Under federal law, 42 U.S.C. section 1983 creates a private cause of action for violations of the United States Constitution. Defendants may assert a qualified immunity defense to a section 1983 claim, by showing lack of malice. Under federal law, malice is defined by objective standards. *See generally Shoemaker v. Smith*, 353 Md. 143, 160–64, 725 A.2d 549 (1999)(reviewing distinctions between qualified immunity under Maryland law and qualified immunity under federal law).

III. Did the circuit court err in holding that, under section 5–522(b), Cline had a qualified immunity defense against intentional tort claims?

IV. Did the circuit court err in holding that there was insufficient evidence of malice to defeat Cline's qualified immunity?

We shall hold that the circuit court erred in concluding that there was no evidence of an unjustified detention, but that the grant of summary judgment was nonetheless proper because, under section 5–522(b), Cline could assert a qualified immunity defense against both Lee's constitutional tort claims and his intentional tort claims, and Lee did not present sufficient evidence of malice to defeat summary judgment. Accordingly, we shall affirm the judgment in favor of Cline.

## I.

### The Circuit Court Erred In Concluding As A Matter Of Law That Cline Did Not Violate Lee's Constitutional Rights

#### A.

#### Alleged Violation Of Maryland Declaration Of Rights

The Court of Appeals "has recognized that a common law action for damages lies when an individual is deprived of his or her liberty in violation of the Maryland Constitution." *Okwa v. Harper*, 360 Md. 161, 201, 757 A.2d 118 (2000). Constitutional tort claims frequently arise from allegations that the police used excessive force during an arrest or search. *See, e.g., id.* (claim of excessive force during arrest); *Shoemaker v. Smith*, 353 Md. 143, 725 A.2d 549 (1999)(claim of excessive force to remove children from home); *Tavakoli–Nouri v. State*, 139 Md.App. 716, 779 A.2d 992 (2001)(claim of excessive force during arrest).

This case does not involve allegations of excessive

force. Nor does it concern a search or arrest.[3] Instead, it turns solely on whether there was an unjustified detention of Lee. For analytical purposes, however, we see no relevant distinction between cases addressing civil liability for a constitutionally unjustified search or arrest, without the use of force, and those addressing civil liability for an unjustified detention.

Lee alleged that Cline unjustifiably detained him for a canine scan after he refused Cline's request to search his car. He theorized that Cline's actions reflected retaliation, racial profiling, or both.

The test for civil liability of an individual police officer is whether the detention was constitutionally unjustified. *See Richardson v. McGriff,* 361 Md. 437, 445–46, 762 A.2d 48 (2000); *Okwa,* 360 Md. at 202, 757 A.2d 118. In turn, the answer to that question depends on "whether the totality of the circumstances justified a particular sort of search or seizure." *See Tennessee v. Garner,* 471 U.S. 1, 8–9, 105 S.Ct. 1694, 1700, 85 L.Ed.2d 1 (1985). Accordingly, in the context of this case, our inquiry into whether Deputy Cline can be held civilly liable is coextensive with our inquiry into whether there was an unreasonable detention of Lee, or, in Fourth Amendment parlance, whether there was a constitutionally justified "second stop."

As grounds for summary judgment, Cline argued that there was no undue delay, and thus no constitutional violation and no constitutional tort. Cline's counsel asked the court to "find that the stop based upon the record was not excessive or unreasonable[.]" The circuit court did so, stating that it "just [did not] think there's any evidence in that regard as to the violation."

---

**3.** Because a canine scan of a vehicle is not considered a search for Fourth Amendment purposes, Lee does not have an unjustified search claim. *See, e.g., Gadson v. State,* 341 Md. 1, 8 n. 4, 668 A.2d 22 (1995), *cert. denied,* 517 U.S. 1203, 116 S.Ct. 1704, 134 L.Ed.2d 803 (1996)("A dog sniff of a vehicle conducted during a lawful detention is not a 'search' within the meaning of the Fourth Amendment").

Lee challenges that finding. He asserts that the evidence, when viewed in the light most favorable to him, is sufficient to establish an unjustified detention. Cline counters that (1) Lee's complaint did not adequately allege a violation of his right to be free from an unlawful seizure under the Maryland Declaration of Rights, and (2) in any event, the court correctly concluded that there was no evidence of a violation of that right. For the reasons set forth below, we agree with Lee and reject both of Cline's justifications for the court's ruling.

## B.

### Claim Of Unjustified Detention

■ Cline argues that the circuit court properly granted summary judgment on the constitutional tort claim because Lee asserted an equal protection claim rather than an unjustified detention claim. He points to the allegation in Lee's third amended complaint that Cline's "actions ... constituted restrictions and deprivations of [Lee's] liberty in violation of Article 24 of the Maryland Declaration of Rights." [4]

Lee acknowledges that he "mistakenly characterized [the detention] as a violation of Article 24 ... as opposed to a violation of Article 26[.]" [5] Lee points out, however, that

---

4. Article 24 of the Maryland Declaration of Rights states

[t]hat no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

Article 24 is Maryland's counterpart to the due process and equal protection guarantees afforded under the Fourteenth Amendment. *See Ashton v. Brown,* 339 Md. 70, 100–01, 660 A.2d 447 (1995).

5. Article 26 states

[t]hat all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are [grievous] and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted.

Article 26 is "the State counterpart of the Fourth Amendment[.]" *Richardson v. McGriff,* 361 Md. 437, 445–46, 762 A.2d 48 (2000).

throughout his prior complaints, his pleadings, and his summary judgment arguments, he "consistently and repeatedly alleged a violation of his state constitutional rights to be free from unreasonable intrusions upon his person." He contends that the "thoroughly vetted" issue of whether there was an unjustified detention is therefore "properly before this [C]ourt for consideration."

Our review of the record confirms that it has been clear from the outset of the pre-trial motions in this case that Lee was asserting an unjustified detention claim. In fact, Cline argued to the federal court that "the thrust of [the constitutional tort claims under both federal and state law] is really a seizure claim under the Fourth Amendment," and incorporated that argument into his subsequent motion for summary judgment in circuit court. The circuit court did not cite the mistaken reference to Article 24 as grounds for granting Cline's motion.

In addition, Cline has never cited Lee's reliance on Article 24 as ground for summary judgment on his unjustified detention claim. It is rare that we will decide an issue that was neither presented to nor decided by the circuit court. *See* Md. Rule 8–131(a). We will not do so here, because we may not affirm summary judgment on grounds other than those that the circuit court cited in support of its decision. *See Lovelace v. Anderson*, 366 Md. 690, 695, 785 A.2d 726 (2001). Accordingly, we shall treat Lee's constitutional tort claim as a claim of unjustified detention in violation of Article 26 of the Maryland Declaration of Rights.

## C.

### Evidence Of Unjustified Detention

Lee argues that the circuit court erred in holding that he did not produce sufficient evidence to support his claim that Cline violated his constitutional rights by detaining him longer than was necessary to resolve the matter of the missing license plate. Cline disputes Lee's interpretation of the evidence, claiming that "[t]he record before this Court dem-

onstrates that the length of the stop was approximately twenty minutes," and that Lee "was detained no longer than reasonably necessary for Deputy Cline to complete the two warnings." Before addressing the respective merits of these positions, we shall review the relevant legal standards for assessing Cline's liability for this traffic stop.

### 1.

### Constitutionally Unjustified "Second Stops"

■ "The Fourth Amendment requires that ... seizures be reasonable. A ... seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37, 121 S.Ct. 447, 451, 148 L.Ed.2d 333 (2000). The Supreme Court has refused to "credit the 'general interest in crime control' as justification for a regime of suspicionless stops." *Id.*, 531 U.S. at 41, 121 S.Ct. at 454. Thus, an officer who detains a motorist must have an articulable basis for the stop. *See id.*

■ When, as in this case, the officer has a specific legitimate reason for stopping a motorist, that detention is reasonable. *See Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). But the officer's continued detention of a motorist stopped for a traffic offense may develop into a second stop. *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983), and its progeny teach that a second stop occurs when the officer detains the motorist "longer than is necessary to effectuate the purpose of the [initial] stop." "[T]he officer's purpose in an ordinary traffic stop is to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or warning. Once the purpose of that stop has been fulfilled, the continued detention of the car and the occupants amounts to a second detention." *Ferris v. State*, 355 Md. 356, 372, 735 A.2d 491 (1999). At that point, "the initial traffic stop .... [can] no longer serve as the Fourth Amendment justification for anything that follow[s]."

*Charity v. State,* 132 Md.App. 598, 613, 753 A.2d 556, *cert. denied,* 360 Md. 487, 759 A.2d 231 (2000).

The officer must have a separately articulable basis for that second stop, because even "seizures that involve only a brief detention" may violate the Fourth Amendment. *See Nathan v. State,* 370 Md. 648, 659–60, 805 A.2d 1086 (2002); *Ferris,* 355 Md. at 371, 735 A.2d 491. "[A]bsent reasonable suspicion, even a reasonable delay would not [be] permitted[.]" *Green v. State,* 145 Md.App. 360, 391, 802 A.2d 1130, *cert. granted,* 371 Md. 613, 810 A.2d 961 (2002).

Refusal to consent to a search of one's vehicle does not give police reason to prolong a traffic stop. Long ago, in *Snow v. State,* 84 Md.App. 243, 578 A.2d 816 (1990), we expressed particular disturbance at the notion "[t]hat law enforcement personnel [would] assume that a citizen exercising his or her constitutional right to reject a search indicates that he or she is guilty of some criminal activity[.]" *Id.* at 261–62, 578 A.2d 816. "A citizen's exercise of the Fourth Amendment right to be free from unwarranted searches does not trigger a reasonable suspicion that he or she is carrying narcotics." *Id.* at 262, 578 A.2d 816.

Cline does not contend that Lee's refusal of his request to search justified the canine scan. Indeed, Cline has never argued that he had any legal justification for a second stop; rather, he asserts that there was no second stop at all. Consequently, the viability of Lee's Article 26 claim turns on whether Cline prolonged Lee's stop in order to obtain the canine scan.

"When ... there is evidence that the investigating officers have not proceeded as diligently as they could under the circumstances, a prolonged detention will be viewed as unreasonable." *Graham v. State,* 119 Md.App. 444, 468, 705 A.2d 82 (1998). "In the absence of a justification for continued detention that manifests itself during the period of time reasonably necessary for the officer to (1) investigate the [violation for which the stop was made] and [the driver's]

license status, (2) establish that the vehicle has not been reported stolen, and (3) issue a traffic citation, the Fourth Amendment prohibits a detention in excess of that period of time." *Pryor v. State,* 122 Md.App. 671, 682, 716 A.2d 338, *cert. denied,* 352 Md. 312, 721 A.2d 990 (1998).

In particular, prolonging "a detention because the K–9 unit is detained elsewhere must be viewed as contrary to the diligence required under a Fourth Amendment reasonableness analysis." *Graham,* 119 Md.App. at 468, 705 A.2d 82. In *Wilkes v. State,* 364 Md. 554, 570, 774 A.2d 420 (2001), the Court of Appeals held that because an investigation incident to a traffic stop was still legitimately underway at the time the canine scan occurred, there was no second stop. That case, however, differs from this case, because that canine unit arrived and conducted the scan before the officer received radio verification of the motorist's driver's license, registration, and warrant status. *See id.*

*Wilkes* is consistent with our decisions emphasizing that the officer has a reasonable amount of time to effectuate the purpose of the stop, so that when a canine is present at the time of the initial stop, or arrives while the officer is still investigating and ticketing the motorist for the traffic offense, a perimeter canine scan of the vehicle may be "entirely proper." *See Pryor,* 122 Md.App. at 681 n. 6, 716 A.2d 338. Many of those decisions, however, involved stops that we concluded were unjustified second stops because they continued after the officer had resolved the reason for the initial traffic stop. *Compare Pryor,* 122 Md.App. at 681 & n. 6, 716 A.2d 338 (unjustified second stop occurred because canine did not arrive for 20–25 minutes after *Whren* stop, and officer made no effort to pursue the traffic violation during that time); *Graham,* 119 Md.App. at 468–69, 705 A.2d 82 (unjustified second stop of passenger occurred because canine scanned 25 minutes after the stop, and after driver had been arrested for driving without a valid license); *Munafo v. State,* 105 Md.App. 662, 673, 660 A.2d 1068 (1995)(unjustified second stop occurred because canine did not arrive until two to three

minutes after officer learned the license and registration were in order); and *Snow,* 84 Md.App. at 267, 578 A.2d 816 (unjustified second stop occurred because canine scan was conducted after speeding ticket was issued) *with McKoy v. State,* 127 Md.App. 89, 100–01, 732 A.2d 312 (1999)(no second stop because canine was present in vehicle of officer who made the traffic stop, and scan was conducted immediately after officer spoke with motorists and before license was verified); *In re Montrail M.,* 87 Md.App. 420, 437, 589 A.2d 1318 (1991), *aff'd,* 325 Md. 527, 601 A.2d 1102 (1992)(no second stop because canine arrived and scanned while officer was still checking license and registration).

As a general rule, then, the time that it takes to complete the investigation and ticketing resulting from the initial stop is not to be considered in determining whether there was a second stop. *See Pryor,* 122 Md.App. at 681–82, 716 A.2d 338. An important caveat to this rule is dramatically illustrated by *Charity v. State,* 132 Md.App. 598, 614–15, 753 A.2d 556, *cert. denied,* 360 Md. 487, 759 A.2d 231 (2000), in which we warned that officers may not delay writing or delivering a traffic citation in order to conduct an intervening narcotics investigation. Delays for that purpose will be treated as a second stop sandwiched between the initial stop and the ultimate delivery of the completed ticket. "Just as a traffic stop ... loses its energizing power to legitimate a contemporaneous but extrinsic investigation once it is formally terminated, so too may the legitimating *raison d'etre* evaporate if its pursuit is unreasonably attenuated or allowed to lapse into a state of suspended animation." *Id.* at 614, 753 A.2d 556 (citation omitted).

On the other hand, we also cautioned in *Charity* that the existence and constitutional significance of any delay cannot be measured solely by the length of a particular stop.

We are not suggesting for a moment that when the police effectuate a traffic stop, they are operating under a "time gun" or may not pursue two purposes essentially simultaneously, with each pursuit necessarily slowing down the

other to some modest extent. We are simply saying that the purpose of the justifying traffic stop may not be conveniently or cynically forgotten and not taken up again until after an intervening narcotics investigation has been completed or has run a substantial course. The legitimating power of a traffic stop to justify a coincidental investigation has a finite "shelf life," even when the traffic stop . . . is not formally terminated.

*Id.* at 614–15, 753 A.2d 556.

*Charity* involved an egregious instance of a suspended investigation of a traffic offense. Charity's vehicle was stopped, along with another vehicle, for a traffic violation. When the police officer asked for Charity's license and registration, he noticed that Charity's vehicle was filled with what turned out to be 72 air fresheners. The officer asked Charity to step out of the vehicle, questioned Charity and his passenger about their activities and destination, and then patted Charity down. The pat down of Charity yielded a small amount of marijuana, and a subsequent search of the vehicle yielded a large amount of cocaine. Hours after Charity arrived at the police station, the officer issued Charity a traffic citation.

We held that there had been an unjustified second stop.

Under the extreme circumstances of this case . . . it is clear . . . that the police purpose of taking appropriate action . . . for [Charity's] traffic infraction of following too closely effectively lapsed into a coma at the instant [the officer] approached the Nissan Maxima and [Charity] rolled down the window.

As soon as Sergeant Lewis smelled and saw the air fresheners, if not before, he was, figuratively as well as literally, "on the scent" of a narcotics violation. His total focus had shifted from the traffic infraction, if it had ever been there, to drug interdiction.

*Id.* at 618, 753 A.2d 556.

In Lee's case, the circumstances do not so clearly establish that there was a second stop. We agree with Cline that there is no comparably conclusive evidence that he suspended his

investigation of the traffic infraction while he awaited the arrival of the canine unit to pursue his otherwise unsubstantiated suspicion that Lee might possess narcotics.

Lee reminds us, however, that an unjustified detention need not be so egregious or obvious as the one featured in *Charity*. He analogizes his case to *Whitehead v. State*, 116 Md.App. 497, 698 A.2d 1115, *cert. denied*, 348 Md. 207, 703 A.2d 148 (1997), and *Munafo*, in which detained motorists also refused to consent to a search of their vehicles, which were then subjected to canine scans. In *Whitehead*, we held that after the officer received information that the motorist had a valid license and was not wanted on any outstanding warrants, and that his vehicle was not stolen, the officer "was under a duty expeditiously to complete the process of either issuing a warning or a traffic citation for whatever traffic offenses that he had observed." *Whitehead*, 116 Md.App. at 499, 503, 698 A.2d 1115. In *Munafo*, we held that once the officer had obtained such information, his continued detention of the motorist for "two to three minutes" while awaiting the arrival of a canine unit, and for another "minute or two" to discuss the situation with the responding canine unit officer, was "brief," but nevertheless "entirely unjustified by the purpose of the original stop." *Munafo*, 105 Md.App. at 673, 660 A.2d 1068.

Read together, these cases teach that the length of a traffic stop, by itself, does not dictate whether there was an unconstitutional second stop. As *Munafo* illustrates, the time consumed by a constitutionally unjustified delay might be "brief," lasting only a couple of minutes. Just as a "time gun" cannot be used to condemn a particular traffic stop, neither can it be used to legitimize one. Instead, we must ask what occurred during the particular stop, and why.

### 2.

### Factual Disputes Material To Determining Whether There Was An Unjustified Second Stop

Evidence that Cline delayed either his preparation or delivery of the warning tickets would establish an unjustified

second stop. Lee points to the following evidence, which he contends raises such an inference.

- Deposition testimony of former supervising officers of Frederick County and the Maryland State Police opining that the tickets written by Cline should not have taken more than five minutes to complete.

- Statistical evidence authenticated by the Frederick County sheriff who supervised Cline, showing that the average length of similar traffic stops throughout the department was approximately 14 minutes, and that the length of four similar "equipment warning" stops by Cline, in particular, ranged from four to ten minutes.

- Lee's deposition testimony that when he refused Cline's request to search the car, Cline retorted that he didn't "need [his] permission to search the car" because he "can get dogs in here and search it without your permission."

- Lee's testimony and the police dispatch tape showing that Cline twice requested a canine unit, with the second request made immediately after Lee refused Cline's search request.

- The police dispatch tape showing that Cline specifically asked how long it would take for the canine unit to arrive, because he was almost finished with his paperwork, and that he was told that the unit would not be there for another three minutes.

- Lee's deposition testimony that about fifteen minutes after the stop, and before the canine unit arrived, Officer Henry arrived as backup, and that Cline then talked with him for several minutes while Lee watched and waited in his car.

- Lee's deposition testimony that the delay from when Cline returned to his cruiser until the canine unit arrived was nearly thirty minutes, during which time he looked at the clock, read a newspaper, listened to the radio, and eventually exited his vehicle when he began to tire of waiting and to wonder about the delay.

- Lee's testimony that when the canine unit officer arrived, three to five minutes elapsed before the officer and dog approached the vehicle, during which time the canine officer talked with Cline for "[a] few minutes."

- Lee's testimony that "after the [canine] officer le[ft], Officer Cline reapproache[d] the car with two warning citations . . . asking for my signature."

Cline argues that "this is not a 'second-stop' case" because, even though he has no independent recollection of the stop, the evidence shows that it lasted only twenty minutes, and that the canine scan occurred during the period that he was doing his paperwork. In support of that position, Cline cites the following evidence:

- The dispatch tape showing that he did not request the "RD & B" (*i.e.*, reporting district and beat) code necessary to complete the warning tickets until 3:23 p.m.

- Cline's deposition testimony that whenever he is writing two tickets, he invariably requests RD & B information when writing the first of the two tickets.

- Lee's admission that while he was waiting, he saw Cline in his police cruiser writing and occasionally speaking into his radio.

- Cline's affidavit that police records showed that the canine unit arrived "no later than 3:31 (15:31)," and the canine unit officer's testimony that scans take approximately ninety seconds to complete.

- Cline's deposition testimony and affidavit stating that he has never delayed a traffic investigation or citation in order to await the arrival of a canine unit.

We conclude that both the length of the stop and whether Cline delayed writing or delivering the warnings for the purpose of obtaining the canine scan are disputed questions of fact that cannot be resolved on summary judgment. As the federal court correctly pointed out, "[t]he earliest time mentioned is 3:09 p.m., which corresponds to the time Officer Cline [allegedly] witnessed the violation from his patrol car. The

latest time mentioned is 3:42 p.m., which is the time that the call was cleared." (Record citations omitted.) Thus, "[r]esolving all evidentiary disputes in Mr. Lee's favor, the stop may have lasted as long as 33 minutes[,]" with the canine unit arriving "twenty one minutes after the earliest time that Mr. Lee could have been stopped."

Moreover, there was "some disputed testimony about exactly what took place during that time." "Mr. Lee testified that, when the second officer arrived, Officer Cline got out of his car and chatted with him. Although 'he does not recall this particular stop,' Officer Cline asserts that he spent the entire time Mr. Lee was detained filling out paperwork and conducting background checks, and that 'he has never detained a motorist to wait for a canine after he has finished his paperwork.' "

We agree with Lee and the federal court that, in this case, the length of the stop and whether Cline prolonged it to obtain the canine scan rest on factual disputes that cannot properly be resolved on summary judgment. For purposes of summary judgment, we must reject Cline's scenario of a twenty minute stop, during which the canine unit arrived before he had an opportunity to complete the warnings. Most notably, we cannot credit the witnesses and documents that he relies on as more accurate reports of the length and events during the stop than the testimony of Lee. The evidence proffered by Lee raised an inference that 20 to 25 minutes elapsed between the time he showed Cline the mangled license plate and Cline returned to his cruiser with Lee's license and registration, and the time the canine scan was finally conducted. Nor can we credit Cline's claim that he diligently used that time to write the tickets, given the statistical evidence regarding the length of similar stops by Cline and other members of the Frederick County Sheriff's Department; the expert opinions that the length of this stop was unreasonable, especially given that the license, registration, and warrant checks were negative; Lee's testimony that Cline spent several minutes conversing with both the backup and the canine unit officers; Cline's statement at 3:23 that he was almost done with the paperwork and

indicating concern about when the canine unit would arrive; and the undisputed evidence that Cline delivered the tickets immediately after the canine unit left.

■ "The summary judgment process is not properly an opportunity for the trial court to give credence to certain facts and refuse to credit others." *Okwa,* 360 Md. at 182, 757 A.2d 118. We hold that there were material disputes regarding whether Cline prolonged Lee's traffic stop while awaiting the arrival of the canine unit. In concluding that there was no evidence of a constitutional violation, the circuit court disregarded Lee's version of events and accepted Cline's, even though Cline could not remember anything about this particular traffic stop. That was error. *See, e.g., id.* (because evidence raised material dispute as to events surrounding forceful arrest, summary judgment was improper).

The next question is whether summary judgment was appropriate despite this error. Cline contends that it was, because, even assuming that he did unjustifiably detain Lee in an improper second stop, the circuit court correctly concluded that he has qualified immunity from civil liability for that constitutional violation due to his lack of malice. We turn now to the immunity issues raised by that ruling.

## II.

### The Circuit Court Properly Held That Cline Had Qualified Immunity Against Constitutional Torts

#### A.

#### The Qualified Immunity Debate

■ At the summary judgment hearing, Lee's attorney argued that, even if the evidence was insufficient to establish that Cline acted with malice, Lee must be allowed to proceed on his constitutional tort claim because state officials like Cline do not have qualified immunity from liability for their constitutional torts. Counsel "maintain[ed] that . . . when you analyze

the constitutional tort in this case, whether or not ... Cline acted with malice is just not germane."

When the circuit court asked Cline's attorney whether he agreed, he replied, "No," taking the position that "you need to prove malice for a Maryland Declaration of Rights claim[.]" Cline reads Md.Code (1974, 2002 Repl.Vol.), section 5–522(b) of the Courts & Judicial Proceedings Article ("CJ"), as a blanket gift of statutory immunity to all State personnel. He argues that, "[b]ased upon the plain language of [section] 5–522(b), it clearly applies to all torts, regardless of type," because the immunity granted by section 5–522(b) "does not differentiate in any manner between intentional and non-intentional, or constitutional and non-constitutional, torts."

The circuit court agreed that summary judgment was appropriate on the constitutional tort claim because there was no indication that Cline acted with malice.[6] In this appeal, Lee challenges that conclusion, while Cline urges us to affirm it.

Citing *Okwa v. Harper*, 360 Md. 161, 757 A.2d 118 (2000), Lee contends that "[t]he principle that governmental immunity is not a defense to [a] claim of violation of state constitutional rights is firmly etched in Maryland law." Cline points out, however, that "the Maryland Court of Appeals has never directly addressed the applicability of the statutory immunity

---

6. The circuit court initially granted summary judgment on all claims based on its finding that there was insufficient evidence of malice. In response, Lee's counsel argued that the court could not grant summary judgment on the constitutional tort claim based on that rationale. When the court asked Cline's counsel to respond, counsel repeated his "belie[f] that you need to prove malice for a Maryland Declaration of Rights claim," and then "request[ed] that the [c]ourt find that the stop based upon the record was not excessive or unreasonable and that the officer did not act with malice." The court cryptically replied that it would "so find because there is no indication. I mean there was certainly probable cause for the stop, et cetera. I mean I just don't think there's any evidence in that regard as to the violation." Both Lee and Cline have interpreted this ruling as an adoption of both of Cline's alternative arguments for summary judgment on the constitutional tort claim. We agree with that construction of the court's ruling, and therefore address whether the court erred in ruling that Cline had qualified immunity for any constitutional tort that he might have committed.

provided in § 5–522(b) to state constitutional torts." He contends that section 5–522(b) abrogated the common law.

We agree with Cline that section 5–522(b) gives State personnel qualified immunity against constitutional torts. A plain reading of the statute in light of its purpose, and a careful reading of the Court of Appeals' decisions regarding section 5–522(b) leads us to this conclusion. In particular, we believe that in *Ritchie v. Donnelly*, 324 Md. 344, 597 A.2d 432 (1991), the Court of Appeals recognized that the General Assembly changed the common law, under which State officials did not have qualified immunity against their state constitutional torts, by granting qualified immunity to State personnel on all types of tort claims.

We recognize that the Court of Appeals' opinion in *Okwa* suggests a different result, and that *Okwa* has been applied as authority for the proposition that State personnel cannot assert a qualified immunity defense to a state constitutional tort claim, notwithstanding the grant of qualified immunity in section 5–522(b). After examining the record and decision in *Okwa*, however, we cannot say that it should be read so broadly.

We shall explain our conclusions by examining the development of statutory governmental immunity for State personnel under section 5–522(b). In doing so, we distinguish that immunity from both the sovereign immunity enjoyed by the State, and from the governmental immunity enjoyed by local governments and their employees under common law and the Local Government Tort Claims Act. These distinctions are critical to understanding the unique nature of the qualified immunity available to State personnel.

### B.

### The Common Law, Section 5–522(b), And Qualified Immunity Of State Personnel Against Constitutional Torts

Under Maryland common law, civil damages could be awarded against a state police officer for violating the plain-

tiff's constitutional rights by conducting a constitutionally impermissible search, arrest, or detention, without regard to whether the officer acted with malice. *Clea v. City of Baltimore*, 312 Md. 662, 541 A.2d 1303 (1988), is the landmark case articulating the principle that, at common law, State officers have no governmental immunity against constitutional torts.

In that case, the Clea family alleged that a Baltimore City police officer mistakenly obtained and executed a search warrant for their house, although a house located on a neighboring street was the correct target. The Cleas acknowledged that the error resulted from the officer's reliance on incorrect address information provided by an informant.

The Court of Appeals concluded that the officer's mistaken search "was clearly a violation of the Cleas' constitutional rights." *Id.* at 679, 541 A.2d 1303. After reviewing three analogous cases involving constitutional tort damage claims against individual police officers, the Court specifically rejected the officer's "argument that a public official, guilty of violating a plaintiff's rights under the Maryland Constitution, should be entitled to a qualified immunity from compensatory damages based upon the absence of malice." *Id.* at 684, 541 A.2d 1303. It held that the officer could be held personally liable for damages resulting from that violation, even though he did not act with malice. *See id.* at 684–85, 541 A.2d 1303. "[A] public official who violates a plaintiff's rights under the Maryland Constitution is entitled to no immunity. The plaintiff may recover compensatory damages regardless of the presence or absence of malice." *Id.* at 680, 541 A.2d 1303.

In this oft-cited passage, the Court explained why:

There are sound reasons to distinguish actions to remedy constitutional violations from ordinary tort suits. The purpose of a negligence or other ordinary tort action is not specifically to protect individuals against government officials or to restrain government officials. The purpose of these actions is to protect one individual against another individual, to give one person a remedy when he is wrongfully injured by another person. Issues of governmental

immunity in this context concern whether, and to what extent, as a policy matter, a governmental official or entity is to be treated like an ordinary private party.

On the other hand, constitutional provisions like Articles 24 or 26 of the Maryland Declaration of Rights ... are specifically designed to protect citizens against certain types of unlawful acts by government officials. To accord immunity to the responsible government officials, and leave an individual remediless when his constitutional rights are violated, would be inconsistent with the purpose of the constitutional provisions. It would also ... largely render nugatory the cause of action for violation of constitutional rights[.]

*Id.* at 684–85, 541 A.2d 1303 (citations omitted).

One of the cases that the *Clea* Court relied on has notable similarities to the case before us now. In *Mason v. Wrightson*, 205 Md. 481, 109 A.2d 128 (1954), the Baltimore City Police Commissioner had responded to a rash of armed crimes by issuing a " 'general order' for police to search 'all persons coming under police suspicion' for weapons." *Clea*, 312 Md. at 682, 541 A.2d 1303. "David T. Mason, an attorney and later a distinguished judge of the Court of Special Appeals," was seated with friends at a tavern when Wrightson, a city officer, "told him to 'stand up and be searched[.]' " *Id.* Mason " 'arose from his chair, but informed Sergeant Wrightson that he did not consent to be searched because there was no legal basis for the search.' " *Id.* Wrightson proceeded to pat down Mason without his consent. Mason then sued the officer for damages.

The trial court granted judgment for Wrightson, but the Court of Appeals reversed, holding that Mason was entitled to nominal damages against Wrightson. *See Mason*, 205 Md. at 489, 109 A.2d 128. Chief Judge Brune explained that

[w]hen a peace officer goes beyond the scope of the law he may become liable civilly and is not shielded by the immunity of the law. The fact that the appellee was acting under

orders of a superior officer does not relieve him of civil liability for his actions which are illegal[.]

*Id.* at 487, 109 A.2d 128.

*Clea* and *Mason* both applied the common law principle that government officials do not have qualified immunity against claims alleging a violation of the Maryland Declaration of Rights. But the Court of Appeals' opinion in *Clea* also recognized that the common law had been dramatically changed by statute. The *Clea* Court specifically acknowledged that immunity for State officials had been "broadened considerably" in 1985, when the General Assembly first adopted a qualified immunity provision for State personnel as part of the Maryland Tort Claims Act (the "MTCA"). *See Clea*, 312 Md. at 671 n. 6, 541 A.2d 1303; 1985 Md. Laws ch. 538 § 2 (effective July 1, 1985).

The MTCA was an historic *quid pro quo.* Before it was enacted, the State and its agencies had absolute sovereign immunity from liability for all torts. "[T]he doctrine of sovereign immunity prevent[ed] the State from being held liable in damages for an unconstitutional act absent a legislative waiver." *Ritchie*, 324 Md. at 373–74, 597 A.2d 432. Thus, before the MTCA, the State could not be held liable, either directly or under principles of *respondeat superior*, for constitutional torts committed by State employees.

In contrast, as *Clea* illustrates, individual state officials did not share the State's sovereign immunity. *See Clea*, 312 Md. at 680, 541 A.2d 1303. The only immunity available to State employees was the limited governmental immunity available to public officials under common law. *See id.* at 680–81, 541 A.2d 1303. That common law governmental immunity did not include qualified immunity against constitutional tort liability. *See id.* at 680–85, 541 A.2d 1303.

The deal reflected in the MTCA was that the State agreed to partially waive its sovereign immunity in exchange for an expanded immunity from liability for a broader category of State employees. *See id.* at 671 n. 6, 541 A.2d 1303. In 1981,

the first version of the MTCA was enacted.[7] *See* 1981 Md. Laws ch. 298; *Foor v. Juvenile Svcs. Admin.*, 78 Md.App. 151, 163, 552 A.2d 947, *cert. denied*, 316 Md. 364, 558 A.2d 1206 (1989). It provided that the State and individual state employees were immune from liability for specified categories of torts, including negligent operation of a motor vehicle, negligent medical care, and negligent supervision at state parks and recreational facilities. *See* 1981 Md. Laws ch. 298.

By 1985, these "categories of waiver and protection ha[d] created a sea of legal uncertainty"; according to the State Treasurer, "[n]either the public nor the State employees [could] ascertain their legal positions without a careful study of each case involving alleged negligence of a State employee in the course of employment. The organized Bar also suffer[ed] from the same confusion." *See* Bill Analysis on S.B. 380, Senate Judicial Proceedings Committee (State Treasurer's explanatory statement). To remedy that problem, the General Assembly broadly expanded the MTCA, to waive the State's sovereign immunity "in all types of tort actions[,]" and grant corresponding immunity to State employees against any tort claims "for which the State or its units have waived immunity" under the act. *See id.;* 1985 Md. Laws ch. 538.

In 1985, the General Assembly responded to these problems by enacting the MTCA in the form that, for purposes of our discussion, is substantively identical to the current statute. Under the MTCA, "State personnel ... have the immunity from liability described under § 5–522(b) of the Courts and Judicial Proceedings Article." *See* Md.Code (1984, 1999 Repl. Vol.), § 12–105 of the State Government Article ("SG"). In turn, section 5–522(b) [8] provides that

---

**7.** The State's first modern waiver of sovereign immunity occurred in 1976. *See* 1976 Md. Laws ch. 450; *Foor v. Juvenile Svcs. Admin.*, 78 Md.App. 151, 162, 552 A.2d 947, *cert. denied*, 316 Md. 364, 558 A.2d 1206 (1989).

**8.** The language now found at section 5–522(b) was originally codified at CJ section 5–401. *See* 1985 Md. Laws ch. 538. In 1990, the legislature transferred this provision to CJ section 5–399.2. *See* 1990 Md. Laws ch.

State personnel ... are immune from suit in courts of the State and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence, and for which the State or its units have waived immunity under § 12–104 of the State Government Article, even if the damages exceed the limits of that waiver.

In SG section 12–104, the General Assembly waived "the immunity of the State and of its units ... as to a tort action," up to "$200,000 to a single claimant for injuries arising from a single incident or occurrence."

The enactment of section 5–522(b) added to the common law governmental immunity that had been available only to State public officials, by encompassing all State personnel (as that term is broadly defined in SG section 12–101). In addition, it gave State personnel qualified immunity from liability for any tort that the State had agreed to be liable for under principles of *respondeat superior.* Thus, section 5–522(b) of the MTCA granted State personnel a new and broader statutory immunity from liability.

The extent and nature of the statutory governmental immunity available to State personnel under section 5–522(b), and its counterpart for local government employees,[9] has been the

---

546 § 3. In 1997, the provision was transferred again, to its current home at CJ section 5–522(b). *See* 1997 Md. Laws ch. 14 § 9. For clarity, in discussing relevant events and case law, we shall refer to this provision as section 5–522(b), regardless of how it was denominated at the pertinent time.

9. CJ section 5–507(b) (formerly codified at CJ section 5–321) provides in relevant part that

an official of a municipal corporation, while acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune as an official or individual from any civil liability for the performance of the action.

Local government employers must "provide a defense for an official ... for any act arising within the scope of the official's employment or authority." CJ § 5–507(b)(3)(i); *see* CJ § 5–302.

Under the Local Government Tort Claims Act, plaintiffs who obtain a judgment against a local government employee may not execute that

frequent subject of debate in the bar and at the bench. The question raised by this case is whether section 5–522(b) affords State personnel a qualified immunity defense against state constitutional tort claims. The particular conundrum that we encounter in answering that question is how to reconcile the language of section 5–522(b), which explicitly grants qualified immunity "from suit . . . and from liability in tort," without excepting constitutional torts, with the Court of Appeals' opinion in *Okwa*, which states that State personnel cannot assert a qualified immunity defense against claims alleging violations of the Maryland Declaration of Rights.

## B.

### *Clea, Ritchie, Ashton, and Okwa*

A careful review of the pertinent case law and statutory developments suggests some answers. We shall review these developments chronologically, in an effort to untwist the individual strands of this knot of governmental immunities.

We start with *Clea*. For good reason, the *Clea* Court explicitly declined to address whether the MTCA gave State personnel qualified immunity against constitutional torts.[10] The Court footnoted its statement of the common law rule that public officials do not have qualified immunity against their state constitutional torts. Acknowledging the broad expansion

---

judgment against the employee if the tortious act or omission was committed within the scope of the public employment, and without malice. *See* CJ § 5–302(b). Instead, the local government employer is "liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government." CJ § 5-303(b).

10. The *Clea* Court cited two reasons for not addressing this question. First, the warrant search challenged in *Clea* occurred before the revised MTCA took effect. *See Clea v. City of Baltimore*, 312 Md. 662, 671 n. 6, 541 A.2d 1303 (1988). Thus, the Court was obligated to apply the common law, rather than the MTCA. Second, "[n]one of the matters" relating to the revised MTCA had been "argued, raised, or even mentioned by the plaintiffs at any stage of th[e] litigation." *Id.* at 671, 541 A.2d 1303. "Absent any briefing or argument whatsoever concerning the issue," the Court "declin[ed] to decide it." *Id.*

of the MTCA, the Court of Appeals stated that it would "intimate no opinion" as to "[w]hether or not the type of actions complained of in this case, by an officer of the Baltimore City Police Department, would be encompassed by the Tort Claims Act[.]" *Clea,* 312 Md. at 671 n. 6, 541 A.2d 1303.

The Court of Appeals did address the effect of section 5–522(b) on the governmental immunity of a state police officer in *Ritchie v. Donnelly,* 324 Md. 344, 597 A.2d 432 (1991). This discussion indicates that the Court treated section 5–522(b) as a legislative grant of qualified immunity against constitutional torts.

Ritchie, a former deputy sheriff in Howard County, alleged that Donnelly, the sheriff, terminated her in violation of federal and state due process and equal protection guarantees. She sued Donnelly " 'individually and in her capacity as Sheriff of Howard County[.]' " *Id.* at 350, 597 A.2d 432. Donnelly moved to dismiss the claims because, since the State would have to pay any judgment rendered against her in her official capacity, Donnelly had sovereign immunity, and because the individual claims failed to state a cause of action, given that all of Donnelly's acts were committed within the scope of her public employment. The circuit court "agreed with both arguments," and granted the motion as to both the "official capacity claims" and the "individual capacity claim" against Donnelly. *Id.* at 368, 597 A.2d 432. Relying on the same distinction between official and individual capacity claims, we reversed the dismissal of the official capacity claims, but affirmed the dismissal of the individual capacity claim.

The Court of Appeals reversed. It held that it was error to split the state claims into individual and official capacity claims, and that Donnelly did not share the State's sovereign immunity. *See id.* at 369, 597 A.2d 432. Citing *Clea, Mason,* and other common law constitutional tort cases, the Court explained that Maryland has never extended sovereign immunity to individual state officials and has never differentiated between "official" and "individual" capacity torts. *See id.* at

370, 597 A.2d 432. The Court emphasized that this was a longstanding principle of Maryland common law.

> This Court has consistently held that a public official who violates the plaintiff's rights under the Maryland Constitution is personally liable for compensatory damages. This liability for damages resulting from unconstitutional acts is in no way based upon the "official/individual capacity" body of law which has developed in federal § 1983 claims. Liability has been imposed upon the government official when his unconstitutional actions were in accordance with or dictated by governmental policy or custom. Liability has also been imposed when the unconstitutional acts were inconsistent with governmental policy or custom. Moreover, ... liability has been imposed upon the official when he was acting in the scope of his employment.

*Id.* at 370–71, 597 A.2d 432 (citations omitted).

The Court then reviewed each of the cited common law cases. Judge Eldridge summarized that precedent as follows:

> (1) the particular official/individual capacity dichotomy that is part of § 1983 law does not apply to state constitutional violations, (2) the doctrine of sovereign immunity prevents the State from being held liable in damages for an unconstitutional act absent a legislative waiver, and (3) *the state official who violates a plaintiff's constitutional right is personally liable for compensatory damages to that plaintiff and, in the absence of statute, does not have the qualified immunity defense available in a § 1983 action.* Therefore, the Court of Special Appeals erred in splitting the state constitutional claims into official capacity and individual capacity claims, and in affirming the dismissal of the claims against the defendant in her "individual capacity." State law does not allow this bifurcation. The dismissal of the state constitutional claims simply should have been reversed.

*Id.* at 373–74, 597 A.2d 432 (emphasis added and footnotes omitted).

Of critical import for this case is the highlighted language in the above-quoted passage of the *Ritchie* opinion. Significantly, the Court added a footnote at the end of that sentence to explain both the meaning of its statement that state officials do not have qualified immunity against state constitutional tort claims and the analytical basis for its holding that none of Ritchie's constitutional claims could be dismissed.

The Court's footnote specifically acknowledged and described the impact that section 5–522(b) had on the common law principle that state officials do not have qualified immunity against claims that they violated the Maryland Declaration of Rights.

> *The General Assembly, however, could provide that the State will be liable for damages resulting from state constitutional torts such as those alleged by the plaintiff in this case, and that the individual employee will be immune.* In other words, the Legislature may substitute state liability for individual employee liability. *The Legislature has done precisely this, under certain circumstances, in the Maryland Tort Claims Act[.]* . . .
>
> As a result of 1985 amendments to the [MTCA], the statute does not exclude specified categories of torts except claims arising "from the combatant activities of the State Militia during a state of emergency[.]" Otherwise, *"tort actions generally" are encompassed, as long as the state employee's actions were not malicious, grossly negligent, or outside the scope of employment* [.] House Bill 364 of the 1989 Session of the General Assembly would have provided that "[i]mmunity is not waived" under the [MTCA] for "any state . . . constitutional claim." In the course of the bill's legislative process, this provision was amended out. Ultimately House Bill 364 did not pass.

*Id.* at 374 n. 14, 597 A.2d 432 (emphasis added and citations omitted).

We read this as an explicit recognition by the Court of Appeals that section 5–522(b) does grant to State personnel a statutory qualified immunity against state constitutional torts.

That construction is reinforced by the final paragraph of this footnote, which makes it clear that the Court actually applied section 5–522(b) to Ritchie's constitutional claims against Donnelly. The Court explained its holding that "the dismissal of the state constitutional claims simply should have been reversed" as a holding that this Court had erred in affirming the dismissal of some of those claims because Ritchie's complaint alleged malice to overcome the qualified immunity that Donnelly had under section 5–522(b). The *Ritchie* Court stated:

> In the present case, ***the defendant is not entitled to the statutory immunity defense under the [MTCA] because of the plaintiff's allegations of malice.*** If at trial the plaintiff fails to prove malice and the defendant asserts immunity under the [MTCA], the circuit court will have to rule on whether the statutory immunity defense is applicable. The issue could also arise in other ways, such as requests for jury instructions.

*Id.* at 374–75 n. 14, 597 A.2d 432 (emphasis added and citation omitted).

The Court of Appeals' subsequent opinion in *Ashton v. Brown,* 339 Md. 70, 660 A.2d 447 (1995), sometimes has been viewed as authority for the proposition that the common law rule that State officials do not have qualified immunity against state constitutional claims applies to cases involving State personnel who are entitled to the statutory immunity granted in section 5–522(b). We reject that interpretation of *Ashton.*

*Ashton* applied the "ordinary" common law rule regarding public official immunity because the constitutional tort claims in that case involved municipal police officers. The officers allegedly violated Article 24 by detaining and arresting the plaintiffs pursuant to an unconstitutional curfew ordinance. Describing the unique nature of the Local Government Tort Claims Act ("LGTCA"), the Court concluded that it differs from the MTCA in that it does not give government employees any immunity *from liability,* but merely certain immunities *from paying a judgment. See id.* at 104, 107–08, 660 A.2d 447. Rather than granting a statutory immunity like

section 5–522(b) of the MTCA, the LGTCA only shifts financial responsibility from the local official to the local government employer, without otherwise expanding the common law public official immunity that is available to local government employees. *See* CJ § 5–302; CJ § 5–303; *Lovelace v. Anderson*, 366 Md. 690, 707, 785 A.2d 726 (2001); *Ashton*, 339 Md. at 104, 107–08 & n. 19, 660 A.2d 447; *see also Housing Auth. of Baltimore City v. Bennett*, 359 Md. 356, 362, 754 A.2d 367 (2000)(reviewing effect of LGTCA on claims against local government employee); *DiPino v. Davis*, 354 Md. 18, 49–50, 729 A.2d 354 (1999)(same).

In *Ashton*, the Court of Appeals cited *Ritchie*, *Clea*, and *Mason* in "reaffirm[ing] the longstanding principle that Maryland law ordinarily provides no immunity to public officials sued for violating state constitutional rights." *Ashton*, 339 Md. at 102, 660 A.2d 447. But the *Ashton* Court did not address whether this rule, which applies "ordinarily" in common law immunities cases, also applies to State personnel who are entitled to invoke the protections that the General Assembly afforded them by enacting section 5–522(b) of the MTCA. *Ashton* cited and applied the common law rule recognized in *Ritchie*, *Clea*, and *Mason*, because the LGTCA did not grant expanded public official immunity to local government employees, and therefore, the common law principles articulated in those three cases also applied to the plaintiffs' claims against the individual city officers.

We view *Ashton* as simply an application of the common law public official immunity to municipal officers, in accordance with the legislative scheme of the LGTCA. The distinction that the *Ashton* Court drew between the common law immunity that local government employees enjoy under the LGTCA and statutory immunity that State personnel enjoy under the MTCA explains why it cited and reaffirmed the common law principles articulated in *Clea*, Ritchie, and *Mason*. Accordingly, the Court's holding in *Ashton* does not address qualified immunity for State personnel, much less contradict the Court's holding in *Ritchie* that section 5–522(b) afforded that

State officer qualified immunity against state constitutional tort claims.

Although *Ashton* must be understood as an application of common law principles to constitutional claims against local government employees, the Court's opinion is otherwise instructive in the case before us. In examining the governmental immunity available to the individual municipal officers under the LGTCA, the *Ashton* Court was called upon to decide which torts section 5–507 encompassed. The language used in section 5–507 to describe which torts are encompassed by the LGTCA closely resembles the language used in section 5–522(b) to describe which torts are encompassed by the MTCA. *See* CJ § 5–507(b); CJ § 5–522(b). Significantly, the *Ashton* Court saw nothing in the language of section 5–507(b) to suggest that the General Assembly carved constitutional torts out of the scope of its protection. To the contrary, the Court concluded in a footnote that "there is no exception in the Local Government Tort Claims Act for constitutional torts. In fact, there is no exception in the statutory language for any category of torts." *Id.* at 107–08 n. 19, 660 A.2d 447.

Given the similar descriptions of which torts are within the scope of the MTCA and the LGTCA, the Court's assessment of which torts fall within the purview of section 5–507 seems equally valid when applied to section 5–522(b). Just as nothing in the language of section 5–507(b) suggests that constitutional torts have been carved out of the LGTCA, nothing in the language of section 5–522(b) suggests that constitutional torts have been carved out of the MTCA.

Indeed, that is precisely the argument that Cline has made in this case. He effectively asks the same question—how can an exception for constitutional torts be read into the similarly clear statutory language used in section 5–522(b)?

The answer, according to Lee, is found in the Court of Appeals' decision and opinion in *Okwa v. Harper,* 360 Md. 161, 757 A.2d 118 (2000). Okwa asserted unjustified arrest and excessive force claims against Baltimore Washington International Airport police officers who arrested him after he had a

verbal altercation with a ticket agent. The Court of Appeals reversed summary judgment in favor of the two officers on Okwa's battery claim because there was a factual dispute as to whether they acted with malice. In doing so, the Court applied section 5–522(b) to that common law claim, and recognized that the officers had a qualified immunity defense against it. *See id.* at 179–80, 757 A.2d 118.

In the last section of its opinion, however, the Court stated that *"[a] state public official alleged to have violated Article 24, or any article of the Maryland Declaration of Rights, is not entitled to qualified immunity. See Ritchie,* 324 Md. at 373, 597 A.2d 432; *Clea v. Mayor and City Council of Baltimore,* 312 Md. 662, 684–85, 541 A.2d 1303 (1988)." *Id.* at 201, 757 A.2d 118. Without citing or discussing section 5–522(b), the Court quoted the familiar passage from *Clea* to explain this "feature" of Maryland law. *See id.* at 201–02, 757 A.2d 118. Ultimately, it concluded that the circuit court erred in granting summary judgment on the state constitutional claims because Okwa had presented sufficient facts to establish,

> for the purpose of summary judgment, [that the officers] did not have legal authority to arrest Mr. Okwa for disorderly conduct. *On this basis alone,* we . . . conclude that summary judgment was granted improperly on [Okwa's] Article 24 claims because an arrest without legal authority qualifies as "an unlawful act by a government official." *Clea,* 312 Md. at 684–85, 541 A.2d 1303.

*Id.* at 202, 757 A.2d 118 (emphasis added).

Lee understandably relies on the *Okwa* Court's opinion as authority for the proposition that, notwithstanding the clear language of section 5–522(b), State personnel do not have qualified immunity against their constitutional torts. Indeed, this Court has done so as well. *See, e.g., Tavakoli–Nouri v. State,* 139 Md.App. 716, 734, 779 A.2d 992 (2001)(citing *Okwa* for the proposition that "a claim under Article 24 against a state public official is not subject to a qualified immunity defense"); *Samuels v. Tschechtelin,* 135 Md.App. 483, 522 & n.

10, 763 A.2d 209 (2000)(citing *Okwa* for the proposition that "State officials are not entitled to qualified immunity in a suit under" Article 24).

A closer examination of *Okwa*, however, persuades us that it should not be applied in that manner. We explain.

The *Okwa* Court cited *Ritchie* only for the common law principle discussed in that opinion, without recognizing *Ritchie's* holding or footnote regarding the effect of section 5–522(b) on the constitutional claim in that case. The *Okwa* Court's citation to *Clea* and to the common law analysis in *Ritchie* reflects that it did not focus on the applicability of section 5–522(b), *and that it was not called upon to do so.*

The decision under appellate review did not require the Court of Appeals to consider the effect of section 5–522(b) on Okwa's state constitutional tort claims. The circuit court granted summary judgment on those claims based solely on its conclusion that Okwa had not presented enough evidence to establish that his arrest was unlawful. The circuit court did not address the legal issue of whether the State officers had a qualified immunity defense against Okwa's Article 24 and 26 claims. On appeal, therefore, the Court of Appeals was not called upon to decide whether the individual officer defendants could assert a qualified immunity defense under section 5–522(b).

Consequently, the Court of Appeals reversed the grant of summary judgment solely because it disagreed with the circuit court's conclusion as a matter of law that Okwa's evidence did not raise an inference that his arrest had been unlawful. "On that basis alone," the Court decided, "summary judgment was granted improperly[.]" *Okwa*, 360 Md. at 202, 757 A.2d 118. The Court then observed that "normally" its analysis would "end at this point," presumably because appellate courts refrain from speculating that summary judgment might have been granted on other grounds not cited by the circuit court. *See id.; Lovelace v. Anderson*, 366 Md. 690, 695–96, 785 A.2d 726 (2001). Because the *Okwa* Court's decision was based only on the narrow "sufficiency of the evidence" grounds

addressed by the circuit court, the general statement that State officers do not have a qualified immunity defense against state constitutional tort claims played no part in the Court's decision to reverse. Instead, that statement was passing dicta on an issue that was not before the Court. *See, e.g., Miles v. State,* 141 Md.App. 381, 388, 785 A.2d 841 (2001)(treating cited language from a Court of Appeals opinion as "passing dicta on an issue not before the Court").

Moreover, it appears that neither Okwa nor the officers argued to the Court of Appeals that the officers could not assert a qualified immunity defense under section 5–522(b) against Okwa's state constitutional claims. Our review of the parties' briefs, and of the Court of Appeals' summary of their arguments, reveals that they took "a different route around" the issues raised by the grant of summary judgment on the constitutional claim. *See id.* at 202, 757 A.2d 118. "The parties argue[d] that, because [Okwa's] Article 24 claims are essentially excessive force claims implicating similar rights protected by the Fourteenth Amendment to the United States Constitution, [the Court of Appeals] should resolve the issue using federal jurisprudence." *Id.*

The thrust of the parties' appellate arguments on the Article 24 count, then, centered on whether, under the facts set forth in the summary judgment record, the officers' " 'conduct was characterized by race-based discrimination, an evil motive, ill will and physical aggression demonstrating an intent to injure' Mr. Okwa." *Id.* at 204, 757 A.2d 118. Thus, the parties assumed that the officers would have immunity against Okwa's state constitutional claims if they acted without malice.

The Court of Appeals addressed the lack of malice argument "for guidance on remand." *See id.* at 202, 757 A.2d 118. Applying the federal standard governing excessive force claims, the Court concluded that the same evidentiary record that precluded summary judgment on the claims arising from the officers' use of force in arresting and detaining Okwa also made the "grant of summary judgment on the Article 24 count . . . improper." *Id.* at 204, 757 A.2d 118.

In these circumstances, we conclude that, because the cited language from *Okwa* was not essential to the Court of Appeals' holding that the circuit court erred in granting summary judgment on the state constitutional tort claims, that statement should not be read as a *sub silentio* overruling of *Ritchie*'s interpretation of section 5–522(b). *See, e.g., In re Lakeysha P.*, 106 Md.App. 401, 430–31, 665 A.2d 264 (1995)(cautioning that unessential dicta might "acquire an acceptable pedigree" through repetition and rhetorical flourish). We cannot reconcile the *Okwa* Court's dicta statement that State officers do not have a qualified immunity defense against State constitutional tort claims with the Court's statement and holding in *Ritchie* that section 5–522(b) granted State personnel a qualified immunity defense. Nevertheless, in light of the *Okwa* Court's narrow holding regarding the sufficiency of the evidence concerning the lawfulness of the Okwa's arrest, and the Court's alternative recognition that there was sufficient evidence of malice to overcome, for purposes of summary judgment, a qualified immunity defense to the Article 24 claim, we view the result in *Okwa* as consistent with the Court's rationale and result in *Ritchie*. Just as Ritchie's malice allegations overcame the qualified immunity defense asserted by Donnelly's motion to dismiss Ritchie's Article 24 claim, Okwa's malice evidence overcame the officers' qualified immunity defense to Okwa's Article 24 claim.

We conclude that *Ritchie* provides the correct interpretation of section 5–522(b). As the *Ritchie* Court instructed, our task is to ascertain the General Assembly's intent in enacting the MTCA. *See Williams v. Mayor of Baltimore*, 359 Md. 101, 115, 753 A.2d 41 (2000). Ordinarily, when the words of a statute are clear, we look no farther for legislative intent. *See id.; Condon v. State*, 332 Md. 481, 491, 632 A.2d 753 (1993). We read that language in the full context in which it appears and in light of other available evidence of legislative intent. *See Williams*, 359 Md. at 116, 753 A.2d 41. The *Ritchie* Court's construction of section 5–522(b) as a legislative grant of qualified immunity against all types of tort claims is consistent with the clear statutory language and purpose of the MTCA, as articulated in *Ritchie*. It is also consistent with the

*Ashton* Court's subsequent construction of analogous language in the LGTCA.

We follow the *Ritchie* Court's conclusion that the State's partial waiver of its sovereign immunity in the MTCA, and its simultaneous grant of qualified immunity, mean that State personnel may assert a qualified immunity defense against State constitutional claims, while, in the absence of malice or gross negligence, the State may not assert a sovereign immunity defense to such claims. As the Court recognized in *Shoemaker v. Smith,* 353 Md. 143, 160–61, 725 A.2d 549 (1999), the MTCA strikes a balance between substantive liability and immunity, in order to advance the twin goals of protecting State personnel but deterring lawless conduct by them.

The MTCA was intended to provide individual State employees some measure of protection against the daunting prospect of being sued for tortious acts or omissions that were undertaken in the line of duty and without actual malice or gross negligence. When properly applied to police officers classified as State personnel, this statutory protection strikes a balance with an individual citizen's right to a remedy when his or her constitutional rights have been violated. As Judge Eldridge pointed out in *Ritchie,* that was both an understandable and permissible change to the common law. *See Ritchie,* 324 Md. at 374–75 n. 14, 597 A.2d 432.; *see also Robinson v. Bunch,* 367 Md. 432, 447, 788 A.2d 636 (2002)(citing the *Ritchie* footnote for the proposition that "the Legislature may ordinarily substitute a statutory remedy . . . for a common law remedy without violating Article 19 of the Declaration of Rights or other Maryland constitutional provisions").

The *Shoemaker* Court recognized that the legislative scheme that the General Assembly created in the MTCA is that State personnel will not be required to litigate State constitutional claims unless there are sufficient allegations and evidence that they acted with malice or gross negligence.[11] *See Shoemaker,* 353 Md. at 161, 725 A.2d 549. In such cases,

---

**11.** In *Shoemaker v. Smith,* 353 Md. 143, 725 A.2d 549 (1999), although the plaintiffs asserted federal and state constitutional claims against

the State or one of its units has been statutorily substituted for the individual State officer as the sole defendant, because it has agreed to provide a remedy for the constitutional tort that the officer committed. *See Robinson*, 367 Md. at 447, 788 A.2d 636; *Ritchie*, 324 Md. at 374–75 n. 14, 597 A.2d 432. Otherwise, when there is a dispute as to whether the individual State defendant acted with malice or was grossly negligent, the burden of litigation and the risk of personal liability remain on the individual defendant.[12] Both the State and the individual defendant must remain in the case.[13]

Accordingly, we hold that Cline did have a qualified immunity defense to Lee's state constitutional tort claim. We shall review the circuit court's conclusion that Lee failed to overcome that defense on summary judgment in Part IV.

## III.

### The Circuit Court Properly Held That Cline Had Qualified Immunity Against Intentional Torts

 Lee argues that the circuit court erred in concluding that Cline could assert a qualified immunity defense to these

---

police officers classified as State personnel, and the circuit court granted summary judgment on those claims, the issue before the Court of Appeals was whether the court's denial of summary judgment on the companion common law claims was appealable as an interlocutory order. For this reason, the Court had no occasion to consider whether the officers could assert a qualified immunity defense under section 5–522(b) against the State constitutional claims.

**12.** Despite the differences between the MTCA and the LGTCA, the ultimate result is that both State and local government officials will not be asked to pay the costs of litigating tort claims or to pay a tort claim unless the official acted with malice or outside the scope of employment, or, in the case of State personnel, acted with gross negligence.

**13.** In this case, however, the State is not a defendant. Although Lee named the Maryland State Police as a defendant, the circuit court dismissed all the claims against it on the ground that Lee failed to substantially comply with the notice requirements of the MTCA. Lee noted an appeal, but voluntarily dismissed it. He then filed an amended complaint that did not name the State as a defendant. Thus, Cline's governmental employer is not a defendant in this lawsuit.

claims. He argues that local officials do not have qualified immunity for their intentional torts, and therefore, State officials should not either.

We disagree, for substantially the same reasons that we have discussed with respect to Lee's constitutional tort claims. Just as constitutional tort claims were not carved out of the statutory immunity granted in section 5–522(b), neither were intentional torts. We reject Lee's analogy between state and local government employees because it is based on the same misunderstanding of the effect that section 5–522(b) had on common law governmental immunities. Moreover, our conclusion is consistent with the Court of Appeals' decisions applying section 5–522(b) to intentional tort claims against State personnel. *See Okwa,* 360 Md. at 179, 757 A.2d 118; *Shoemaker,* 353 Md. at 157, 725 A.2d 549.

We hold that the circuit court properly permitted Cline to assert a qualified immunity defense to the intentional tort claims. We turn now to the final question—whether the summary judgment record contained sufficient evidence to raise an inference that Cline acted with malice.

## IV.

### The Circuit Court Properly Held That There Was Insufficient Evidence Of Malice To Overcome Cline's Qualified Immunity

As his final ground for reversal, Lee contends that the circuit court erred in concluding that there was insufficient evidence of malice to overcome Cline's qualified immunity. We again disagree.

"The question raised for purposes of immunity under the State Tort Claims Act is whether a jury could reasonably find that [defendant's] conduct, given all of the existing and antecedent circumstances, was motivated by ill will, by an improper motive, or by an affirmative intent to injure the [plaintiff]." *Shoemaker v. Smith,* 353 Md. 143, 164, 725 A.2d 549 (1999). "Malice may be inferred from the

surrounding circumstances." *Green v. Brooks*, 125 Md.App. 349, 377, 725 A.2d 596 (1999). Thus, a malicious "motive or animus may exist even when the conduct is objectively reasonable. If it does, there is no immunity under the State Tort Claims Act." *Shoemaker*, 353 Md. at 164, 725 A.2d 549.

Whether Lee has proffered sufficient evidence to raise an inference of malice is a question of law. *See id.* at 167, 725 A.2d 549. In resolving that question, we recognize that, "[b]ecause the determination of malice, in particular, involves findings as to the defendant's intent and state of mind, there is much less likelihood of it presenting an 'abstract issue of law.' " *Id.* at 168, 725 A.2d 549.

Nevertheless, to successfully oppose summary judgment based on qualified immunity, Lee must point to facts sufficient to raise an inference of malice. "[P]laintiffs may not rely upon the mere existence of . . . an intent, motive, or state of mind issue to defeat summary judgment." *Thacker v. City of Hyattsville*, 135 Md.App. 268, 301, 762 A.2d 172, *cert. denied*, 363 Md. 206, 768 A.2d 55 (2001). For this reason, we frequently have rejected attempts to rely on bare allegations that a particular act raises an inference of malice. *See, e.g., Baltimore Police Dep't v. Cherkes*, 140 Md.App. 282, 330–31, 780 A.2d 410 (2001)(rejecting bare allegation of malice based on training and supervision of police officers); *Tavakoli–Nouri v. State*, 139 Md.App. 716, 730 n. 2, 779 A.2d 992 (2001)(rejecting bare allegation of malice based on national origin discrimination); *Green*, 125 Md.App. at 380, 725 A.2d 596 (rejecting bare allegation of malice based on mistaken identity arrest); *Penhollow v. Bd. of Comm'rs*, 116 Md.App. 265, 294–95, 695 A.2d 1268 (1997)(rejecting bare allegation of malice based on gender bias); *Williams v. Prince George's County*, 112 Md.App. 526, 551, 685 A.2d 884 (1996)(rejecting bare allegation of malice based on wrongful arrest).

Lee contends that Cline's violation of his Fourth Amendment rights by unjustifiably detaining him for the canine scan is sufficient to raise an inference of ill will and improper motive. He argues that

Deputy Cline's reaction to Mr. Lee's assertion of his right not to be searched, stating that he didn't need Mr. Lee's permission but would call the canine, indicates an intent to punish Mr. Lee for asserting his rights. That intent to frustrate Mr. Lee's attempt to assert his rights to be free from unreasonable intrusion is manifested by Deputy Cline's dispatch statement that he was summoning the canine unit because Mr. Lee had "Already told me there's no way he's going to give me consent to search." His further action of detaining Mr. Lee beyond the time that it took to effectuate the purpose of the traffic stop, under the pretext of conducting necessary components of the traffic stop, establishes the inference of evil and rancorous motive to deliberately and wilfully violate Mr. Lee's right against unreasonable detention.

Cline counters that none of these actions or comments cited by Lee shows the type of actual malice that defeats qualified immunity. We agree.

Preliminarily, we agree with Cline that, "to infer 'actual malice' from the mere act of a police officer calling for [a canine] scan after a motorist has refused consent to search would render" the law permitting such scans "entirely nugatory" because "it is . . . a matter of course for an officer to request permission to search from the driver of a vehicle first, before calling for a canine scan." We do not think that a jury reasonably could infer that, by itself, the use of a standard police measure such as requesting consent to search a vehicle at a traffic stop or requesting a canine scan during that stop can raise an inference of malice.

More importantly, however, even if Lee is correct that Cline detained him longer than was necessary to investigate and ticket him in connection with the license plate, we agree with the circuit court that this does not establish an inference of malice. To the extent that Lee seeks to infer malice solely from a police officer's commission of a constitutional tort, without regard to the circumstances surrounding the specific tortious act or omission, we conclude that is not a reasonable

inference. If we were to define every violation of constitutional rights as a malicious act, individual public officials could become personally liable for even the most "innocent" constitutional torts that they might commit. By shifting the financial responsibility for tortious acts committed in the course of public employment, from the government entity back to the individual public official, we would undermine the legislative scheme of providing an effective remedy for tortious conduct without unduly burdening public officials to the extent that public employment is discouraged.

Consequently, to evaluate whether there is enough evidence to suggest that Cline acted with malice, we must examine the particular circumstances of Lee's detention. We see no evidence of the type of "ill will" or "improper motive" that raises an inference of malice sufficient to defeat qualified immunity from any prolonged detention that might have occurred in this instance. The manner in which Cline is alleged to have violated Lee's constitutional rights does not suggest that Cline harbored the type of targeted animus that indicates malice for purposes of defeating qualified governmental immunity.

The initial traffic stop was undisputedly for the legitimate purpose of investigating Lee's missing license plate. Cline did not know Lee prior to the traffic stop. *Cf. Thacker,* 135 Md.App. at 307–08, 762 A.2d 172 (discussing inference raised by evidence of prior animosity between arresting officer and plaintiff). As Lee also has conceded, there is no evidence to support Lee's suspicion that Cline harbored any racial animus toward him. *Cf. id.* at 305–06, 762 A.2d 172 (officer's comments during encounter leading to allegedly unjustified arrest supported an inference of racial animus); *Nelson v. Kenny,* 121 Md.App. 482, 494–95, 710 A.2d 345 (1998)(same).

Lee gives great weight to the evidence that Cline unjustifiably detained him out of anger or to punish him. We recognize that anger and frustration are relevant to assessing whether a police officer's use of force to arrest, search, or detain raises an inference of malice. In *Shoemaker,* for example, the Court of Appeals observed that a jury reasonably

could find malice from evidence that two police officers "acted ... out of anger or frustration over the[ ] unwillingness to cooperate" on the part of two children who were being removed from their home, and their parents. *See id.* at 168, 725 A.2d 549; *see also Okwa,* 360 Md. at 182, 757 A.2d 118 (arresting officers' "extreme and overzealous desire to punish Mr. Okwa for failing to obey immediately their instructions" may have resulted in their use of excessive force during arrest). Similarly, anger might be relevant to assessing whether an officer misused his authority to arrest, search, or detain. In *Thacker,* for instance, we held that a jury could find malice from evidence that the officer decided to arrest the plaintiff based on his personal dislike and frustration with the plaintiff prior to the specific encounter that led to his allegedly unjustified arrest. *See Thacker,* 135 Md.App. at 304–09, 762 A.2d 172.

But we cannot agree with Lee that "mere" anger or frustration, or without any use of force or threat of force by Cline, much less inappropriate force, or without any evidence suggesting that Cline had an impermissible animus for misusing his authority to detain Lee, is sufficient to raise an inference of malice. In *Shoemaker,* the Court of Appeals did not infer malice solely from the officers' anger and frustration with the plaintiffs. The Court specifically cited the officers' extremely harsh threats coupled with "unusually rough conduct which ... is beyond that which one would normally expect from a neutral and dispassionate law enforcement officer supposedly engaged in" a law enforcement task. *See Shoemaker,* 353 Md. at 168, 725 A.2d 549. Similarly, in *Thacker,* we did not infer that the allegedly unjustified arrest was made with malice solely from the officer's anger and frustration with the plaintiff. Instead, we detailed the specific evidence that suggested the officer may have had a racial animus, a personal animus, or a financial animus for making the arrest. *See Thacker,* 135 Md.App. at 305–09, 762 A.2d 172.

This summary judgment record does not contain the detailed evidence of ill will that raised an inference of malice in *Shoemaker, Okwa, Thacker,* and *Nelson.* In contrast to those

cases, if Cline violated Lee's constitutional rights by prolonging Lee's detention for a canine scan, the evidence here indicates that he did so in a manner that does not suggest the type of unusually harsh and targeted animus that is necessary to overcome Cline's qualified immunity. We think that evidence indicating that a police officer improperly detained a motorist for a short time longer than was necessary to complete a traffic ticket because he became angry or frustrated when the motorist would not agree to a consensual search does not establish the "malice" necessary to shift liability for that conduct from the State to the individual officer.

We find no error in the circuit court's holding that Lee failed to proffer sufficient evidence of malice to overcome Cline's qualified immunity. We shall affirm the grant of summary judgment.

**JUDGMENT AFFIRMED ON ALL COUNTS. COSTS TO BE PAID BY APPELLANT.**